[No. B037872. Second Dist., Div. Seven. Jan. 30, 1991.]

BARBARA BUCHAN, Plaintiff and Respondent, v.
UNITED STATES CYCLING FEDERATION, INC., Defendant and
Appellant.

COUNSEL

Thomas & Price, Allan I. Shatkin and Everett S. Hinchcliffe for Defendant and Appellant.

James P. Carr, Kelly, Herlihy & Bane and Andrew N. Chang for Plaintiff and Respondent.

OPINION

**WOODS (Fred), J.**—This is an appeal by appellant/defendant United States Cycling Federation, Inc. (USCF) from the judgment of the Los Angeles County Superior Court, the Honorable Irwin J. Nebron, Judge presiding, in favor of respondent/plaintiff, Barbara Buchan (Buchan). Reversed.

## I.

### FACTS AND PROCEEDINGS BELOW

On July 7, 1983, Buchan filed a form complaint for personal injury against defendants, USCF, Self Magazine, and 50 fictitious defendants alleging, inter alia, that "[d]efendants and each of them sponsored a bicycling race at which the plaintiff was a participant. The defendants, and each of them, negligently failed to supervise and monitor the bicycle race with the result that the plaintiff was involved in a collision with other cyclists suffering the injuries and damages complained of."

On October 1, 1986, USCF filed its "First Amended Answer to Unverified Complaint." Included in the affirmative defenses was an allegation that Buchan assumed all the risks, hazards and dangers, and that Buchan expressly waived and relinquished all legal rights to seek damages from USCF for her injuries.

Buchan's complaint arises out of an accident that occurred on July 9, 1982, during a bicycle race from Malibu to Westlake Village. The race was part of a four-race competition to select the United States Women's World Road Race Team. The four-race series was sponsored by Conde Nast

Publications, Inc.[1] (Nast), publishers of Self Magazine, and was named the Self Magazine Cycling Circuit. Defendant, USCF, was the sanctioning body for the races. Buchan was involved in a fall during the race and received head injuries.

Buchan's superior court form complaint includes three causes of action. The first and second causes of action are couched in terms of general negligence against USCF, Magazine, and Does 1 to 25. The first cause of action for general negligence alleges that defendants negligently supervised and monitored the bicycle race with the result that plaintiff was involved in a collision with other cyclists. The second cause of action for general negligence alleges that defendants negligently failed to require, recommend or warn that participants in the bicycle race should wear hard-shell protective helmets. This second cause of action further alleges that defendants negligently sanctioned the use of an unsafe leather helmet. The third cause of action is couched in terms of product liability against Does 26 through 50. It describes the defective product as a leather bicycle helmet.

On October 9, 1986, Magazine filed a motion for summary judgment. The basis for the summary judgment motion was the agreement and release of liability signed by Buchan at the time she applied to USCF for the 1982 renewal of her racing license and the release that she signed as part of her application for entry in this Self Magazine Cycling Circuit series of races. On January 8, 1987, the court, the Honorable Martha Goldin, Judge presiding, granted Magazine's motion for summary judgment, based upon the releases signed by plaintiff.

On December 10, 1986, USCF filed a motion for summary judgment, based upon the same releases as in Magazine's motion for summary judgment. On April 2, 1987, the court, the Honorable Marvin D. Rowen, Judge presiding, granted USCF's motion for summary judgment. The court granted the motion for summary judgment based upon *Okura* v. *United States Cycling Federation*,[2] ruling that "the summary judgment motion must be

---

[1] The complaint of Buchan states causes of action against "Self Magazine." However, Self Magazine appeared in the action as defendant Conde Nast Publications, Inc. We find no amendment to the complaint of Buchan which would either substitute Conde Nast Publications, Inc., for defendant, Self Magazine, or make an appropriate amendment substituting the correct defendant for one of the fictitiously named defendants. However, the case was apparently litigated by all parties on the theory that Conde Nast Publications, Inc., was the true defendant vice "Self Magazine." Hereafter we refer to "Magazine" for convenience and when we do so it includes the named defendant, Self Magazine, and defendant, Conde Nast Publications, Inc., unless otherwise indicated.

[2] *Okura* v. *United States Cycling Federation* (1986) 186 Cal.App.3d 1462 [231 Cal.Rptr. 429].

granted." On April 8, 1987, Judge Rowen vacated his April 2, 1987, order granting the motion for summary judgment following further oral argument, and then denied the motion for summary judgment. Defendant's counsel argued that the same issues were raised as in Magazine's motion before Judge Goldin. This court infers from the colloquy revealed in the transcript of proceedings that Judge Rowen felt that international cycling affects the public interest and distinguished *Okura* on that basis.[3] Judge Rowen then ruled as follows: "The Court is going to change its position and enter as its final ruling in this matter the denial of the motion for summary judgment."

Jury trial commenced on July 7, 1988. Although no substantial evidence issue has been raised on appeal, we deem it advantageous to present not only a summary of the procedural history of the case but also a synopsis of the pertinent evidence herein for background purposes to enchance an understanding of our reasons for reversing the judgment.

Testimony at time of trial established that Buchan got involved in bicycle racing for the first time in 1975, and first raced in competitive events as a cyclist in 1975. She received her first USCF license in 1975. By 1981, Buchan was a category II (highest classification) rider. Buchan had participated in 100 races and considered herself to be an experienced road racer. Buchan testified that she knew there were risks involved in cycling.

Witness Jolanta Goral testified that Buchan was an "elite rider," that falls and crashes in bicycle races are common, that she agreed with Buchan's testimony that in 75 percent of bicycle races there are crashes involving the fall down of multiple riders, and that good bicycle riders are involved in crashes, which is part of the sport.

Buchan testified that her goal was to make the Olympic team in bicycling and that most of the female riders in 1982 had the same goal. Buchan admitted that it was her signature on the 1982 renewal application.

---

[3] Code of Civil Procedure section 437c, subdivision (g) provided as follows at the time of USCF's motion for summary judgment:

"(g) Upon the denial of a motion for summary judgment on the ground that there is a triable issue as to one or more material facts, the court shall, by written or oral order, specify one or more material facts raised by the motion as to which the court has determined there exists a triable controversy. This determination shall specifically refer to the evidence proffered in support of and in opposition to the motion which indicates that triable controversy exists. The court shall also state its reasons for any other determination. The court shall record its determination by court reporter or written order."

We find nothing in the record to indicate that the court complied with section 437c, subdivision (g); therefore we resort to reasonable inferences to be drawn from the record. Appellant has waived any error in the trial court's failure to comply with section 437c, subdivision (g) by having neglected to raise the issue in the trial court or on this appeal.

There are falls in at least 75 percent of the races. Seventy-five percent of the riders that Buchan is aware of have broken a collarbone by falling. Buchan had two prior racing falls. Ninety percent of the riders get broken collarbones. Buchan further testified as follows:

"Q. You did realize that falls are a common occurrence?

"A. Falls, yes.

"Q. And I think you said they occur maybe 75 percent of the time?

"A. Yes."

Witness Ronald Smith, Ph.D., a sports psychologist, stated that there is a high degree of risk in bicycle racing. From a reading of Buchan's deposition transcript, he determined that she was aware of the risk of personal injury that existed in bicycle racing, and was aware of the risk of serious head injury.

Witness Deborah Winsor, a participant in Buchan's race, acknowledged the risks of bicycle racing, and indicated that bicycling can get pretty rough.

Witness Lester D. Earnest, a USCF member since 1973, testified that there were certain inherent dangers in participating in cycling races, including the risk of significant personal injuries, head injuries, and even death.

Witness Paul Pearson testified that injuries are common in bicycle racing, and all riders realize the risk of injury. Witness Edward Borysewicz, a cycling coach, testified that crashes and falls are common; riders shouldn't race unless they are willing to accept the risks.

Otto Wenz, another witness, testified that head injuries are a known hazard of cycling.

On July 20, 1988, USCF, made a motion for a directed verdict, pointing out that the subject activity does not affect the public interest; nobody has to go out there and undertake this risk. The court, the Honorable Irwin J. Nebron, Judge presiding, denied the motion, without prejudice. The court distinguished *Okura*, since the race was the only way to get to the Olympics. Defense counsel argued that it was decided as a matter of law that bicycle racing is not a matter affecting the public interest. The court con-

cluded: "I think that this court has to give weight to the *Ordway*[4] case here."

Witness Mary Pieper testified that injuries are common, it is common that a number of riders go down, and she accepts the proposition that accidents and injuries are one of the inherent risks of the sport. Pieper decided to get out of bicycle racing because of the risks of injury. Counsel stipulated that if Mary Pieper were called to testify pertaining to the releases, she would have testified that she had read the subject releases, knew what was in them, expected to be bound by them, and expected them to prohibit her from bringing a lawsuit.

Witness Robert Ross, a mechanical engineer and USCF official, testified that crashes of the instant variety are common and a part of the sport. Ross told Buchan on several occasions that she should wear a better helmet, and she acknowledged that, but said she didn't like to since it was too heavy and too hot.

The trial judge, Irwin J. Nebron, reviewed the transcript of proceedings on USCF's motion for summary judgment before Judge Rowen, stating that this obviously was "a very, very close issue in his mind." Judge Nebron ruled, as a matter of law, that all six *Tunkl*[5] factors had been satisfied. The court ruled that under *Ordway* a question of fact was presented, and the jury would have to determine if Buchan had acted reasonably or unreasonably. The court was of the opinion that *Okura* was distinguishable. The court refused defendant's special instructions 1, 1A, 1B, 3, and defendant's 4.30 (express assumption of risk).[6] In regard to the jury instruction on implied assumption of risk, Buchan's counsel agreed that falling off a bicycle and hitting your head is within the inherent risks of bicycling. Buchan's counsel argued that Buchan's conduct was not "entirely reasonable."

In closing argument, Buchan's counsel conceded that Buchan assumed the risks of bicycle racing, but argued that she only chose selective risks: "He says Barbara chose to accept the risks of the sport. Sure she did. Up to a point. She did not sign on for accepting the risk of someone who didn't belong out there and someone who the cycling federation knew didn't belong out there."

---

[4] *Ordway* v. *Superior Court* (1988) 198 Cal.App.3d 98 [243 Cal.Rptr. 536].

[5] *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].

[6] Defendant's special jury instructions 1, 1A, 1B and 3 are not included in the record on appeal, but we infer that they pertain to assumption of risk defenses.

In addressing the applicability of the doctrine of reasonable implied assumption of risk, counsel for Buchan argued that it applied to Buchan's choosing to wear a hairnet helmet, rather than Buchan's choosing to participate in the sport of bicycle racing, with all the risks included therein. Buchan's counsel stated: "One of the defenses you heard about is this thing in the law called reasonable implied assumption of risk. [¶] Now, the way it works is that the plaintiff is only barred, which means she is only out of court, if her actions were 100 percent reasonable and that is in this case if she was 100 percent reasonable in choosing to wear a hairnet helmet knowing as she did of the risks. [¶] Now, she doesn't claim that's 100 percent reasonable. Throughout the trial, evidence has been presented by the defense to suggest that this is not reasonable."

The following jury instructions were given by the court: "The court has ruled as a matter of law that the release and assumption of risk agreements executed by plaintiff Buchan are not enforceable." "If plaintiff acted reasonably in participating in this bicycle race, her implied assumption of the risk of injury prevents her from recovering damages from defendant for that injury."

On July 29, 1988, the special verdict was returned and filed in favor of Buchan and the poll of the jury revealed that the verdict was nine to three. The jury responded in the negative to the interrogatory: "Did plaintiff act reasonably with respect to her participating in this bicycle race?" The jury further found Buchan to be 12 percent negligent. Juror Daisietta Kim made a personal statement in the record, stating that she was profoundly disappointed with the process through which this decision was reached. Ms. Kim criticized the jury in the following manner: "In Barbara Buchan versus the USCF, one should be compelled to come to grips in sufficient depths with such notions as assumption of risk, acting with reasonable prudence, and the boundaries of personal choice and freedom. This jury in my view did not make a careful enough attempt to understand in general the issues fundamental to the case."

Following a discussion about the jury having to decide on the implied assumption of risk, the following colloquy took place:

"THE COURT: Was this a unanimous verdict?

"MR. HINCHCLIFFE: No, it's 9/3.

"THE COURT: Then you convinced three people.

"MR. HINCHCLIFFE: I convinced them on all the issues including Ms. Kim, as you recall, that couldn't believe what was going on in front of her."

The judgment on special verdict provides that "plaintiff, Barbara Buchan, have and recover from said defendant, United States Cycling Federation, judgment in the sum of $1,151,176.00."

Notice of entry of judgment was served on August 2, 1988. USCF filed a motion for judgment notwithstanding the verdict and notice of intention to move for a new trial on August 17, 1988. The motion for judgment notwithstanding the verdict and motion for new trial were denied on September 22, 1988.

On October 5, 1988, USCF filed a timely notice of appeal from the judgment.

The motions for judgment notwithstanding the verdict and new trial were heard on September 20, 1988, and September 22, 1988. The motions commenced with the recognition by defense counsel that "the issue in this case is the same issue that's always been there, the question of validity and legal effect of these releases." Defense counsel stated that in this particular case the evidence is overwhelming that this accident is the kind of accident that one has to anticipate in a bicycle race and that plaintiff had said people go down 75 percent of the time.

On the issue of collateral estoppel vis-à-vis Judge Martha Goldin's ruling on Magazine's motion for summary judgment, the judgment states there is no triable issue of fact as to the validity and legal effect of the releases signed by plaintiff. USCF contended that this issue was resolved and established as a matter of law, since the summary judgment entered by Judge Goldin was not appealed. Buchan conceded that the party against whom USCF is trying to assert the claim of waiver is the same and that there is a final judgment. Buchan argued that collateral estoppel is inapposite since the issues are not the same. USCF contends that the issue regarding enforceability of the same release, as a matter of law, was clearly the same issue. The court denied the motion for judgment notwithstanding the verdict on USCF's collateral estoppel theory, stating: "I think the issues are different."

In regard to the *Tunkl* factors, USCF argued: "There is not one reported case in this state or, in fact, that I could find in the entire country where any court has ever held that a sport or recreational activity affects the public policy and therefore allows a release to be voided on that ground."

In the posttrial motions, USCF emphasized that in *Okura* the appellate court upheld the release as to an inexperienced rider, and that to void the release as to an experienced rider would make no sense: "And I'm asking the court when you look at what the ruling was, when the court voids this release as to experienced, elite riders, who know what she is doing, knows the risks she is assuming and as the court says as a matter of law, I rule you cannot assume those risks and the court acknowledges that Okura, Mr. Okura, as an inexperienced rider, because that's how you distinguish the case, is it not? He's inexperienced. Probably doesn't know as much about bicycle racing and the risks that plaintiff does. [¶] When the court distinguishes that case and says that he can assume the risks because he's inexperienced, doesn't know what he's taking on. When you look at that, I think this whole thing has to make sense to people and I can't make any sense out of that. If the court can, I guess this is the time to do it so we can understand how it makes sense."

Buchan's counsel argued that there was evidence that Buchan was unreasonable in wearing the particular helmet. Counsel for USCF contends such an argument was a "red herring" and that the true issue is whether Buchan reasonably assumed the risks inherent in a dangerous sport.

USCF further contends that the court, in effect, took the issue of the defense of implied assumption of risk away from the jury, by the manner in which the court ruled that Buchan could not expressly assume the risk by stating:

"There was evidence presented by the defense throughout the trial that the plaintiff was unreasonable in wearing the helmet that she wore and which directly related to her head injury and despite that evidence, Mr. Hinchcliffe wanted—argued for a different result.

"So he wants his cake and he wants to eat it, too.

"Mr. Hinchcliffe: All I want is the court to exercise its obligation under the law to sit as a 13th juror and make a ruling on whether or not this plaintiff made a free and voluntary and knowing choice to enter a dangerous sport and to tell us why that's different than the plaintiff in the Ordway case.

"Now, the jury—I have real problems with the jury making any decision on implied assumption of risk for the simple reason that how can I in good conscience stand before this jury and say, 'Ladies and gentlemen, we started this morning off in closing argument with the judge telling you that this

plaintiff as a matter of law can not expressly assume the risks. [¶] But let me tell you something. I'm going to explain to you folks how she can impliedly do what the court told you she can't expressly do.'

"As far as I'm concerned, the jury's determination, they made no determination on that because your ruling on the expressed assumption of risk took it out of their hands.

". . . [¶] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"But the point being this: How do you convince them that you can do by implication what you can't expressly do? I think that issue, by the court's ruling, was in a sense taken out of my hand."

## II.

### CONTENTIONS

The contentions formulated and stated by USCF on appeal are as follows:

(a) Whether the doctrine of collateral estoppel barred Buchan's action against USCF where the summary judgment for Magazine granted by Superior Court Judge Martha Goldin established the validity and legal effect of express releases and established that the releases which barred Buchan's action also barred Buchan's action against USCF, based upon the same releases, as a matter of law;

(b) Whether *McClain* v. *Rush*,[7] wherein a defendant successfully asserted the doctrine of collateral estoppel against a plaintiff pertaining to an issue established as to another defendant in a motion for summary judgment, acts to bar Buchan's action against USCF;

(c) Whether the trial court erred in denying USCF's motion for summary judgment and motion for a directed verdict based upon releases signed by Buchan under which she expressly assumed all risks inherent in bicycle racing;

(d) Whether the trial court erred in impliedly holding that an express assumption of risk is void if it relates to a "career" activity;

(e) Whether the trial court erred in impliedly holding that an individual's aspirations to be in the Olympics is a matter of "public interest" as defined in *Tunkl*; and

---

[7] *McClain* v. *Rush* (1989) 216 Cal.App.3d 18 [264 Cal.Rptr. 563].

(f) Whether Buchan's claim was barred by the reasonable implied assumption of risk (RIAR) doctrine, where Buchan, an experienced cyclist, testified that falls and crashes occur in about 75 percent of all bicycle races.

## III.

### DISCUSSION

We find it unnecessary to address all six ((a) through (f)) of the contentions raised by appellant on this appeal since a reversal based upon issues presented in appellant's contention (c) that the trial court erred in denying USCF's motion for summary judgment and USCF's motion for directed verdict in that the releases signed by Buchan, under which she expressly assumed all risks inherent in bicycle racing, effectively barred her action, is dispositive of all remaining contentions.

The agreement and release of liability signed by Buchan at the time she applied for the 1982 renewal of her United States Cycling Federation racing license and the release that Buchan signed as part of her application for entry in the Self Magazine Cycling Circuit series of races constitute an express assumption of risk.

The release and assumption of risk provision in the 1982 renewal application reads as follows:

"AGREEMENT AND RELEASE OF LIABILITY

"I am an amateur in good standing and wish to be a licensed athlete under the Constitution, Bylaws and General Rules of the United States Cycling Federation, Inc. I certify that the information on this application, as corrected by me, is truthful.

"*I acknowledge that cycling is an inherently dangerous sport in which I participate at my own risk* and that the United States Cycling Federation, Inc. ('USCF') corporation formed to advance the sport of cycling, the efforts of which directly benefit me. In consideration of this agreement of the United States Cycling Federation, Inc. to issue an amateur license to me, hereby on behalf of myself, my heirs, assigns and personal representatives, *I waive, release and forever discharge the United States Cycling Federation, Inc.*, its employees, agents, members, sponsors, promoters and affiliates whosoever *from any and all liability*, claim, loss cost or expense arising from or attributable in any legal way to any action or omission to act of any such person or organization in connection with sponsorship, organization

or execution of any bicycle racing or sporting event, including travel to and from such event, in which I may participate as a rider, team member of spectator.

"To the best of my knowledge I have no physical condition which would interfere with my ability to participate in or attend any such event or would endanger my health hereby.

"DATED:　　　　　JAN 6-82　　　　　*/S/ Barbara Jean Buchan*
　　　　　　　　　　　　　　　　　*Signature of Applicant"*

(Italics added.)

The release and assumption of risk provision contained in the application for entry to the Self Magazine Cycling Circuit reads as follows:

"*I hereby waive, release and discharge any and all claims of damages for death, personal injury* or property damage which I may have, or which may hereafter accrue to me, as a result of my participation in the Event. The *release* is intended to discharge in advance SELF Magazine, the Conde Nast Publications, Inc., and other sponsors, *USCF*, the promoting clubs, the officials and any other individuals, their respective agents, their directors, and employees, and any involved municipalities or other public entities, *from and against any and all liability arising out of or connected in any way with my participation in the Event*, even though that liability may arise out of negligence or carelessness on the part of the persons or entities mentioned above. I further understand that serious accidents occasionally occur during bicycle racing, and that participants in bicycle racing occasionally sustain mortal or serious personal injuries as a consequence thereof.

"*Knowing the risks of bicycle racing, I nevertheless hereby agree to assume those risks and to release and hold harmless all of the persons or entities mentioned above* who (through negligence, carelessness or otherwise) might be liable to me, or my heirs or assigns, for damages. It is further understood and agreed this waiver, release and assumption of risks is to be binding on my heirs and assigns."[8] (Italics added.)

The foregoing release and assumption of risk document was signed by Buchan on July 2, 1982. ■ It is well established that in interpreting a written instrument it is the duty of an appellate court to conduct a de novo

---

[8] The record is far from clear pertaining to the Self Magazine release and whether the motion before Judge Rowen and the trial before Judge Nebron considered this release. Inasmuch as the USCF release, which was clearly in issue in the litigation, is extremely similar to the Self Magazine release, we infer that the ruling of Judge Rowen and the judgment of Judge Nebron encompasses the Self Magazine release.

review and make a determination in accordance with the applicable principles of law. (*Southern Cal. First Nat. Bank* v. *Olsen* (1974) 41 Cal.App.3d 234, 241 [116 Cal.Rptr. 4].)

Division Two of the Court of Appeal for the Second Appellate District was recently confronted with the effect of an express written release signed by a race car driver. In *National & Internat. Brotherhood of Street Racers, Inc.* v. *Superior Court* (1989) 215 Cal.App.3d 934 [264 Cal.Rptr. 44],[9] an action by a race car driver against a race organizer and the county landowner, for injuries sustained in a crash, defendants moved for summary judgment on the basis of a release signed by plaintiff, and petitioned for a writ of mandate when the trial court denied their motions.

The Court of Appeal issued the writ directing the trial court to grant the motion. Although plaintiff alleged in *National* that defendants were liable for failure to assure the presence of appropriate extrication equipment and properly trained rescue personnel, the court held the release was unlimited in scope and, in unqualified terms, released all claims arising from plaintiff's participation in the race. (215 Cal.App.3d at p. 937.) It held that to be effective a release need not achieve perfection, but it suffices if it is clear, unambiguous, and explicit, and that it express an agreement not to hold the released party liable for negligence. (215 Cal.App.3d at p. 938.)

The court pointed out that plaintiff is a professional automobile and race car mechanic and "an experienced race car driver." (215 Cal.App.3d at p. 936.) In connection with competing in the race, all participants, including plaintiff, signed the printed release. As in the present case, the tenor of the release was an agreement that any injury the signatories might suffer would not be the legal responsibility of the race organizer. Division Two of the Second Appellate District had no difficulty in concluding that plaintiff's blanket release of responsibility on the part of the race organizer was all-encompassing. The court stated:

"In cases arising from hazardous recreational pursuits, to permit released claims to be brought to trial defeats the purpose for which releases are requested and given, regardless of which party ultimately wins the verdict. Defense costs are devastating. Unless courts are willing to dismiss such actions without trial, many popular and lawful recreational activities are destined for extinction.

". . . It suffices that a release be clear, unambiguous, and explicit, and that it express an agreement not to hold the released party liable for negli-

---

[9] Hearing denied by the California Supreme Court on February 1, 1990.

gence. (See *Madison* v. *Superior Court* (1988) 203 Cal.App.3d 589, 596-600 [250 Cal. Rptr. 299].) This was accomplished here." (215 Cal.App.3d at p. 938.)

In *Bennett* v. *United States Cycling Federation* (1987) 193 Cal.App.3d 1485 [239 Cal.Rptr. 55], the trial court granted summary judgment for the sponsors of a bicycle race on the ground that the bicyclist had signed a hold-harmless and release agreement before participating in the race. The Second Appellate District, Division Five, held that the release agreement was valid and enforceable.

"There is little doubt that *a subscriber of the bicycle release at issue here must be held to have waived any hazards relating to bicycle racing that are obvious or that might reasonably have been foreseen. As plaintiff points out, these hazards include 'collisions with other riders, negligently maintained equipment, bicycles which were unfit for racing but nevertheless passed by organizers,* [and] bad road surfaces . . . .' " (*Bennett* v. *United States Cycling Federation, supra*, 193 Cal.App.3d 1485, 1490.) (Italics added.)

In the present case, Buchan acknowledges that falls and crashes are common occurrences in bicycle races and occur in about 75 percent of all races. Falls and crashes are acknowledged as risks of injury inherent in the sport of bicycle racing.

In the Second Appellate District case of *Madison* v. *Superior Court, supra*, 203 Cal.App.3d 589, decided by Division Three, defendants petitioned the Court of Appeal in a wrongful death action for a writ of mandate to direct the trial court to vacate its order denying their motion for summary judgment and to enter a new and different order granting that motion, based upon a waiver and release signed by plaintiffs' decedent pursuant to his enrollment in defendants' scuba diving training course. The decedent had drowned while participating in defendants' training course, after a diving instructor had left him alone on the surface. The release expressly stated that it was the decedent's intent to exempt and relieve defendants from any liability for their negligence, but the trial court found that triable issues of fact existed as to whether the release agreement constituted an express assumption of all risks so as to bar the wrongful death claim by plaintiffs, the decedent's family.

The Court of Appeal granted the writ. It held that the release could not operate to limit plaintiffs' right to prosecute a wrongful death claim, since the decedent had no power or right to waive that cause of action on behalf of his heirs. (203 Cal.App.3d at p. 596.) However, it also held that a plaintiff in a wrongful death action is subject to any defenses which could have been

asserted against the decedent, including an express agreement by the decedent to waive the defendants' negligence and assume all risks. (*Id.*, at p. 600.) By the language of the release, the decedent expressly manifested his intent to relieve defendants of any duty to him and to assume the entire risk of any injury, and no public policy reason existed to preclude him from validly executing the agreement. (*Id.*, at pp. 600-601.) Thus, the court held that the agreement was enforceable and was sufficient to cover the particular risk of injury which occurred. (*Id.*, at p. 602.)

This court has not been apprised of any case in which the California Supreme Court or the Courts of Appeal have voided a release on the ground of "public interest" as defined by *Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d 92, in the sports and recreation field. The *Madison* court was specific in stating that the concept of "public interest" has no applicability to sports activities. The *Madison* court opined:

"Moreover, we perceive of no reason why Ken could not validly execute such a broad agreement. '[N]o *public policy* opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party . . . .' [Citation.]

■ "In placing particular contracts within or without the category of those affected with a public interest, the courts have revealed a rough outline of that type of transaction in which exculpatory provisions will be held invalid. Thus the attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. [1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents. [Citation.]" (*Madison* v. *Superior Court, supra,* 203 Cal.App.3d 589, 598-599.)

The court in *Kurashige* v. *Indian Dunes, Inc.* (1988) 200 Cal.App.3d 606 [246 Cal.Rptr. 310] concluded that a release signed by motorcycle dirt bike riders did not involve a public interest. The court, in language equally applicable here, stated that the release "agreement used here was printed legibly, contained adequate, clear and explicit exculpatory language and indicated defendants were to be absolved from the consequences of their own negligence. [Citation] Furthermore, *it did not involve the public interest*: defendants' business was not generally thought to be suitable for public regulation; defendants did not perform a service of great importance to the public, and the business was not a matter of practical necessity for members of the public; and defendants' customers did not place their persons under defendants' control. [Citation.]" (Italics added.) (*Id.*, at p. 612.)

"It thus seems clear, absent a public interest involvement, that Civil Code section 1668 will not invalidate contracts which seek to exempt one from liability for simple negligence or strict liability. This is such a case. Here, Ken certainly had the option of not taking the class. There was no practical necessity that he do so. *In view of the dangerous nature of this particular activity defendants could reasonably require the execution of the release* as a condition of enrollment. Ken entered into a private and voluntary transaction in which, in exchange for an enrollment in a class which he desired to take, he freely agreed to waive any claim against the defendants for a negligent act by them. This case *involves no* more a *question of public interest* than does motorcross racing (*McAtee* v. *Newhall Land & Farming Co.*) (1985) 169 Cal.App.3d 1031 [216 Cal.Rptr. 465]), sky diving (*Hulsey* v. *Elsinore Parachute Center, supra*, [1985] 168 Cal.App.3d 333 [214 Cal.Rptr. 194]), or motorcycle dirtbike riding. (*Kurashige* v. *Indian Dunes, Inc.* (1988) 200 Cal.App.3d 606 [246 Cal.Rptr. 310].)" (Italics added.) (*Madison* v. *Superior Court, supra*, 203 Cal.App.3d 589, 598-599.)

In *Okura* v. *United States Cycling Federation, supra*, 186 Cal.App.3d 1462, the Second Appellate District, Division Five, upheld the granting of a summary judgment on behalf of South Bay Wheelman and United States Cycling Federation based on the Southern California Cycling Federation's standard athletes entry blank and release form. Except for a few minor discrepancies, the wording on that entry blank and release form is identical to the language in the Magazine's entry blank and release form.

The plaintiff in *Okura* claimed that the release that he executed to enter the bicycle race in which he was injured was void as against public policy as a transaction affecting the public interest as defined in *Tunkl* v. *Regents of the University of Southern California, supra*, 60 Cal.2d 92. The court ana-

lyzed each of the six *Tunkl* factors and found that appellant's situation did not fall within the guidelines set out in *Tunkl*. The *Okura* court held:

"Measured against the public interest in hospitals and hospitalization, escrow transactions, banking transactions and common carriers, this transaction is not one of great public importance. There is no compelling public interest in facilitating sponsorship and organization of the leisure activity of bicycle racing for public participation. The number of participants is relatively minute compared to the public use of hospitals, banks, escrow companies and common carriers. Also, the risks involving in running such an event certainly do not have the potential substantial impact on the public as the risks involving in banking, hospitals, escrow companies and common carriers. The service certainly cannot be termed one that 'is often a matter of practical necessity for some members of the public.'" (*Okura v. United States Cycling Federation, supra,* 186 Cal.App.3d at p. 1467.)

Buchan seeks to distinguish the reasoning of the *Okura* court by pointing out that at least as to her this race was a practical necessity and was part of her overall goal to eventually participate in the 1984 Olympics. She uses this subjective importance to classify the *Hulsey*[10] and *McAtee*[11] cases cited by the *Madison* court as "hobby cases" and to distinguish herself from what she describes as the "Sunday cyclist" in *Okura*. However, this court knows of no case that has ever intimated, much less held, that public importance and necessity is to be measured by a subjective as opposed to an objective test.

Simply because Okura was riding in an open class does not mean that he too could not have had further goals which possibly included even some day competing at the Olympic level. Such a goal is commendable but that does not make bicycle racing a matter of great public importance or turn participation in such a race into a practical necessity for anyone. No matter how important it is to any individual, bicycle racing does not rise to the level of public importance as that of hospitals and hospitalization, escrow transactions, banking transactions, and common carriers.

Buchan complains that an unqualified cyclist was allowed to compete and that the United States Cycling Federation rules only established minimum standards for helmets and did not force her to wear a sturdier helmet. However, collisions and falls are an inherent risk of the sport according to testimony adduced at trial and Buchan had complete control of the helmet

---

[10] *Hulsey* v. *Elsinore Parachute Center, supra,* 168 Cal.App.3d 333.
[11] *McAtee* v. *Newhall Land & Farming Co., supra,* 169 Cal.App.3d 1031.

that she chose to wear, as long as that helmet met the minimum standards set by USCF. It was solely her decision not to wear a sturdier helmet.

The *Okura* case establishes that bicycle racing, no matter how important it is claimed to be by any particular participant, is not a matter sufficiently affected with the public interest so as to void clear and unambiguous exculpatory clauses.

The trial court denied the motion for summary judgment on April 8, 1987, apparently and by inference from the transcript of proceedings, under a misconception of the legal latitude to be given to the term "public interest." The court erroneously equated "public interest" with publicity and notoriety, although the court did not state the reasons for denying the motion for summary judgment.

"THE COURT: Doesn't international cycling affect the public interest?

"MR. HINCHCLIFFE: I don't believe—

"THE COURT: Do you recall a year ago the papers were full of the fact that—and I think the President of the United States invited the first American who won an international cycling race in France, if I recall correctly, to the White House. [¶] And the American Public was fixed to their television screens during the course of the Olympics when cycling was being shown on television because this was a matter of great public interest."

"THE COURT: Isn't the national interest of our country concerned with its amateur athletics and how well its cycling team does in national, international competition?

"MR. HINCHCLIFFE: I am sure there are many members of the public that are bicycle hobbyists and care about bicycle racing activities, but does that mean it is a transaction affecting the public interest? [¶] I don't believe it does under Tunkl. It is not of significant importance to the population in general and to society in general to bring it up to that level.

"THE COURT: Would the fact that the President of the United States brings a winner of an international cycling event to the White House bring it up to that level?

"MR. HINCHCLIFFE: No."

"The Court would like to hear you address a public policy issue. Let's assume that this Court accepts that this is a matter of sufficient public

interest to qualify under Tunkl and that the only way that one can achieve status to become an international racer with all of the rewards resulting therefrom and recognizing the realities of our own contemporary society wherein we, as a society, elevate people involved in the entertainment field or in the athletic field to great heights of notoriety and potential financial reward to them so that there is tremendous motivation for young people, or people of all ages to give up everything else that they do and to train to work for, participate in the kind of events that are going to lead them to the rewards that they hope will be found."

The court's remarks, in reversing its prior grant of summary judgment herein, that the cycling event of the Olympics "was a matter of great public interest" misconceived that concept as it relates to the instant setting. A matter of great interest to the public is not a matter of "public interest" within the *Tunkl* and *Okura* context, requiring "essential services" which must be involuntarily utilized by the general public. It is readily apparent that the court's original grant of summary judgment was correct. The court's remarks that our society elevates athletes to great heights of notoriety, a winner of an international cycling event is brought to the White House, and the American public was fixed to their televisions during the cycling event of the Olympics "because this was a matter of great public interest" clearly reveal that the court reversed itself upon an incorrect view of "public interest."

Buchan's claim that she was a serious cyclist with dreams of going to the Olympics seems to be the key piece of evidence relied on by the trial court in analyzing each of the six *Tunkl* factors, and in failing to grant the motion for a directed verdict and motion for summary judgment. Buchan testified that all of the riders in this race dreamed of going to the Olympics and that that was a common dream of competitive cyclists. If that is one of the keys used by the court for voiding these releases, then it raises an interesting question as to whether or not the court would enforce these releases against some of the riders in this race, yet void them as to others. Obviously, the top riders under the court's analysis would all be entitled to void the releases. However, other riders in the race that are competing for the same spot on the world's team but do not have the same dream of going to the Olympics would find that the court would uphold the releases as to them.

The plaintiff chooses to characterize herself, based upon her subjective intentions, as being somehow different and apart from Mr. Okura. But there is nothing in the Court of Appeal decision in *Okura* to suggest that the court would have felt compelled to void this release as to Mr. Okura if he

would have just told the Court of Appeal that he "was a serious cyclist that someday hoped to make the Olympic team."

The case of *Bennett* v. *United States Cycling Federation, supra*, 193 Cal.App.3d 1485, cites *Okura* for the proposition that the release is binding and enforceable in light of *Tunkl*. (*Id*. at p. 1491.) Again, the Court of Appeal makes no mention in its decision as to whether the state of mind of the racer or the racer's skill level have anything to do with the enforceability of the release. The court does not state that the release is enforceable against Mr. Bennett only because he is not a serious cyclist who does not have Olympic dreams. Instead, the only statement made about the plaintiff is as follows: "On June 10, 1984, plaintiff entered an amateur bicycle race sanctioned and conducted by defendants." (*Id.*, at p. 1487.) Again, the validity and enforceability of the release is in no way dependent upon Mr. Bennett's cycling experience or dreams. It is dependent only on the fact that he signed an assumption of risk agreement and release and that under *Okura*, bicycle racing is not an activity affecting the public interest.

Apparently, the trial court felt that Buchan as an elite rider that had been involved in about 100 road races and was well aware of the risks of bicycle racing cannot as a matter of public policy expressly assume those risks. On the other hand, a leisure cyclist who is less experienced and probably has less of an understanding of the sport of bicycle racing and the risk involved in it can assume those risks. In other words, the trial court seems to be saying that it would void a knowing and intelligent decision by an experienced rider to expressly assume the risks inherent in participating in the sport of bicycle racing, while it would enforce an express assumption of risk by an inexperienced rider who may not realize how inherently dangerous this sport is. Logic, common sense, and decisions of the Courts of Appeal show the fallacy of such a proposed rule.

Logic and common sense dictate that if releases are to be voided as a matter of public policy based on the skill level and dreams of participants, then the law should protect inexperienced participants as opposed to elite, experienced riders who are fully aware of and knowingly and voluntarily accept the risks inherent in participating in the sport.[12]

---

[12] We are appreciative of the "additional" facts proffered by the dissent but following review of the facts set forth in the majority opinion and the reasonable inferences to be drawn therefrom we see no necessity to revise that portion of the opinion dealing with the pertinent facts and proceedings in the trial court. Nor do we find that the dissent has moved the majority to reconsider the results in the lead opinion. The distilled result of this appeal is that there is no pervading public interest in amateur bicycle racing. This is so regardless of the level of competition, the motive of the participants, or of the fact that the course is provided and

IV.

DISPOSITION

The judgment is reversed. The matter is remanded to the trial court with directions to enter a new and different judgment in favor of defendant/appellant, USCF, commensurate with the views expressed herein. Appellant to recover costs of appeal.

Lillie, P. J., concurred.

**JOHNSON, J.**—I respectfully dissent.

If the facts in this case were as stated by the majority I would join in voting to reverse the judgment. The majority opinion leads one to believe this is a case about a bicycle racer, with "dreams" of going to the Olympics, who fell off her bicycle and was injured in the course of a race. The majority opinion misstates the facts in this case by omitting any mention of the cause of plaintiff's accident and the federation's responsibility for it; by glossing over plaintiff's standing in the world of amateur bicycle racing; and by ignoring the domination over amateur bicycle racing exercised by the United States Cycling Federation (Federation). These facts, set forth more fully below, distinguish this case from the *Okura* line of cases relied on by the majority[1] and support the trial court's ruling that the releases signed by plaintiff are unenforceable by the Federation.

FACTS AND PROCEEDINGS BELOW

Ms. Buchan suffered severe head injuries as the result of a crash during a bicycle race in Malibu conducted by the Federation. The evidence relevant to the issues on appeal is as follows:

A. *Ms. Buchan's Athletic Career*

Ms. Buchan had been a top-level athlete all her life. In high school she was one of the state's premier track and cross-country runners and she received a full athletic scholarship to attend Boise State. In college, she competed against the best long-distance runners in the country and

---

maintained for all who wish to use it. The *Tunkl, supra,* analysis in this case does not dictate the invalidation of the written release signed by Buchan.

[1] *Okura* v. *United States Cycling Federation* (1986) 186 Cal.App.3d 1462 [231 Cal.Rptr. 429].

qualified for the national championships in both the 3,000- and 5,000-meter races.

She started competitive cycling and obtained her first Federation racing license in 1975, at the age of 18. Toward the latter part of 1979 she decided to devote full time to amateur cycling.

Ms. Buchan testified she was an assistant coach at University of California San Diego for a short time after graduating from college. But, as she progressed in the sport of cycling, the travel and training requirements required her to give up this job and become a full-time athlete. In her view, bicycle racing was her career. Her typical day began at 7 a.m. with stretching exercises, then breakfast, then a minimum two-hour bicycle ride. Three nights a week she attended weight training classes and three nights a week she attended gymnastics classes.

Ms. Buchan's goals, at the time of her injury, were to represent the United States in the Cycling World Championship in 1982 and in the Summer Olympics in 1984. The evidence shows these goals were objectively realistic, not simply "dreams" as the majority characterizes them. In 1981, the Federation placed Ms. Buchan in the highest category in women's racing. In races that year she consistently placed high among the country's best cyclists and was invited to join the top 30 women cyclists in training at the United States Olympic Training Center in Boulder Springs, Colorado. The purpose of the training center was to develop top amateur athletes for Olympic competition. It clearly took more than "dreams" to be invited to train at the Olympic Training Center.

B. *The Federation's Control Over National and World-level Cycling*

The Federation is the governing body in the United States for the Olympic sport of cycling. The Federation is a member of the United States Olympic Committee. The Amateur Sports Act of 1978 (36 U.S.C. § 371 et seq.) regulates amateur competitive cycling. The act imposes duties upon the Federation as the sole national governing body of Olympic amateur cycling including the duty of ensuring safety precautions are taken to protect the athletes. (36 U.S.C. § 392(b)(1)(B)(vi).)

The Federation has total control over the conduct of national-level events such as the 1982 world trials in which plaintiff was injured. Other groups are allowed to conduct local or regional races, but all national, international and Olympic-level races are conducted solely by the Federation. A United

States cyclist wishing to compete in world-class cycling events must have a Federation license.

The Federation divided women cyclists into three categories: A-2 was limited to the best, most experienced world-class racers, followed by A-3 and A-4 riders. Ms. Buchan was classified as an A-2 rider. These categories were created because putting world-class A-2 cyclists and beginning A-4 cyclists together in the same race greatly enhanced the risk of injury due to the great variance in the skill levels between the two categories. Accordingly, in national-level events, A-4 riders who were first-year riders were not allowed to compete. In the unusual case where, because of a small entering field, A-4 riders were mixed in with A-2 racers, the field was staggered so that A-2 racers started a few minutes before the A-4 cyclists to avoid racing alongside each other.

The Federation required every applicant for a license to sign an application form containing an "Agreement and Release of Liability" which provided, in relevant part: "I acknowledge that cycling is an inherently dangerous sport in which I participate at my own risk . . . . In consideration of the agreement of the United States Cycling Federation, Inc. to issue an amateur license to me hereby on behalf of myself, my heirs, assigns and personal representatives, I waive, release and forever discharge the United States Cycling Federation, Inc., its employees, agents, members, sponsors, promoters and affiliates whosoever from any and all liability, claim, loss cost or expense arising from or attributable in any legal way to any action or omission to act of any such person or organization in connection with sponsorship, organization or execution of any bicycle racing or sporting event, including travel to and from such event, in which I may participate as a rider, team member or spectator."

Ms. Buchan signed this agreement when she applied for her 1982 license. She testified she was given no opportunity to negotiate the terms of the release. The evidence at trial showed the Federation had no procedure whereby a racer could, for an additional fee, purchase insurance against the Federation's negligence.

### C. *The Federation's Conduct of the 1982 World Trials*

In the summer of 1982, the Federation conducted a series of four races referred to by the competitors as the "World Trials." The World Trials were the top competitive events of 1982 in the United States. The top finishers in the World Trials would be automatically selected to represent the United States in 1982 at the world championships in England. In turn,

the members of the world team would be favored to make the United States team in the 1984 Summer Olympics. In sum, the 1982 World Trials were a major stepping stone to the 1984 Olympics.

Racers entering each World Trials event were required to sign a release of liability which provided, in relevant part:

"I hereby waive, release and discharge any and all claims of damages for death, personal injury or property damage which I have, or which may hereafter accrue to me, as a result of my participation in the Event. This release is intended to discharge in advance SELF MAGAZINE, the CONDE NAST PUBLICATIONS INC., and other sponsors, [the Federation], the promoting clubs, the officials and any other individuals, their respective agents, their directors, and employees, and any involved municipalities or other public entities, from and against any and all liability arising out of or connected in any way with my participation in the Event, even though that liability may arise out of negligence or carelessness on the part of the persons or entities mentioned above. I further understand that serious accidents occasionally occur during bicycle racing, and that participants in bicycle racing occasionally sustain mortal or serious personal injuries as a consequence thereof."

Prior to the World Trials, the Federation's policy was to segregate the racers according to their classification; novices raced against novices; elite riders, such as Ms. Buchan, raced against other elite racers. The purpose of this segregation was safety. Although the risk of a crash in a cycling event is ever present, allowing a novice rider to race in a pack of elite world-class racers substantially increases the risk. In an Olympic-level race, the elite racers know each other, rely upon each other's experience and know what to do and what not to do in tight, pressure situations.

In the 1982 World Trials, the Federation decided to admit novice racers into the event on a case-by-case basis. Thus, unknown to the elite racers before the World Trials began, the Federation determined a novice rider, Mary Pieper, possessed sufficient skills to be admitted into the field of elite racers. Ms. Pieper had received her first Federation license in 1982 and was a category A-4 rider, i.e., a novice. At the time Ms. Buchan signed the application for entry into the 1982 World Trials, no national-level event had ever been conducted in which novice riders were allowed to race alongside the national-level racers.

### D. *The Plaintiff's Injury*

The World Trials commenced with a 40.5-mile race in Laguna Beach. As the tight pack of racers sped downhill reaching a speed of 30 miles per hour,

Mary Pieper weaved in and out of the pack, trying to get past the group. Pieper was not accustomed to and was scared of large packs of riders. Pieper's front wheel hit the rider in front of her, and she went down, causing a chain reaction of fallen riders.

Although that day there were no serious injuries, a number of the cyclists, Ms. Buchan among them, approached the president and other officials of the Federation present at the race site and complained vigorously that Pieper did not belong in the World Trials and was a danger to the competitors. The Federation's chief referee had the authority to reverse the prior decision allowing a first-year rider to race if it was demonstrated that the rider was so inexperienced as to be unsafe and a danger to the world-class cyclists. Despite the complaints and the Federation's knowledge that Pieper presented a danger to the world-class cyclists, the Federation allowed Pieper to continue racing.

Six days after the Laguna Beach race, the World Trials resumed in Malibu. On the morning of the Malibu race, the complaints about Mary Pieper's presence in the race were renewed and again ignored. After five miles of the race, the pack of riders descended downhill, reaching a speed of fifty miles per hour. Once again, Mary Pieper began weaving in and out of the pack and lost control of her bicycle. Her front wheel struck a racer's back wheel and Pieper fell, causing an immediate chain reaction of numerous riders to spill, this time with tragic consequences. Ms. Buchan landed squarely on her head and sustained a catastrophic injury to her brain.

Ms. Buchan was tended to on the scene by Paul Pearson, an emergency medical technician, who had been covering cycling races since 1972. He testified hers was the most severe head injury he had ever seen in a bicycle race. There was evidence a helmet meeting the standards in existence in 1982 would have prevented any brain injury whatsoever. Ms. Buchan was not wearing such a helmet.

At the hospital, Ms. Buchan was admitted in an extreme comatose state and immediately underwent emergency brain surgery to save her life. She remained in a coma for four weeks and when she left the hospital she could not walk or talk.

At the scene of the accident, the cyclists blamed Mary Pieper for the crash. Federation officials immediately disqualified Pieper from competing in further World Trials races.

## E. *Trial Court Proceedings*

Ms. Buchan filed a complaint for personal injuries against the Federation and Conde Nast Publications which sponsored the Malibu race in which she was injured. The gravamen of her complaint was that defendants negligently failed to supervise and monitor the race. Defendants denied they acted negligently and alleged Ms. Buchan expressly and impliedly assumed all risks related to the race.

The trial court granted a motion for summary judgment by defendant Conde Nast Publications based on the releases Ms. Buchan signed upon applying for her racing license and upon entering the Malibu race. Ms. Buchan did not appeal this judgment. The trial court denied a motion for summary judgment by the Federation based on these same releases.

Ms. Buchan's personal injury action was tried before a jury. After hearing the evidence, the trial court ruled, as a matter of law, the two written releases Ms. Buchan signed were unenforceable under Civil Code section 1668 and *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693]. The case was submitted to the jury on the issues of negligence, contributory negligence and reasonable implied assumption of the risk. The jury returned special verdicts in favor of plaintiff. The jury found the Federation was negligent, Ms. Buchan was contributorily negligent, but Ms. Buchan did not reasonably assume the risk of the Federation's negligence. In conformity with the jury's special verdict, the court entered judgment for Ms. Buchan in the sum of $1,151,176.

### Discussion

Civil Code section 1668 provides "[a]ll contracts which have for their object, directly or indirectly, to exempt any one from responsibility for . . . violation of law, whether willful or negligent, are against the policy of the law." In *Tunkl* v. *Regents of University of California, supra*, 60 Cal.2d at page 96, the court, without resolving conflicting interpretations of Civil Code section 1668, noted, "[t]he cases have consistently held that the exculpatory provision may stand only if it does not involve 'the public interest.' " Accepting the premise "the exculpatory clause which affects the public interest cannot stand" the court proceeded to ascertain "those factors or characteristics which constitute the public interest." (*Id.* at p. 98.) The court concluded, after a review of previous decisions, an "invalid exemption involves a transaction which exhibits some or all of the following characteristics[:] [1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in perform-

ing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed unde r the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Id*. at pp. 98-101, citations omitted.) The court characterized this list of factors as a "rough outline of that type of transaction in which exculpatory provisions will be held invalid." (*Id*. at p. 98.)

Although subsequent cases have invalidated exculpatory clauses upon finding all six *Tunkl* factors were present,[2] a score of 100 percent on the Tunkl test is not required to invalidate an exculpatory clause on public policy grounds. "To meet that test, the agreement need only fulfill some of the characteristics above outlined; . . ." (*Tunkl, supra*, 60 Cal.2d at p. 101.) As we have previously observed, the Supreme Court has not told us how many characteristics have to be satisfied—or which ones—before exculpatory clauses become unenforceable. (*Gardner* v. *Downtown Porsche Audi, supra*, 180 Cal.App.3d at p. 717.) Nor did the court indicate whether certain factors should be given greater weight than others. Nevertheless, we do not believe the court intended a mechanical application of the factors mentioned in *Tunkl*. Instead, the focus should be on the two principal concerns reflected in the court's opinion: (1) Is the party seeking exculpation engaged in a service of great importance to the public? (2) Does providing this service give the provider a decisive advantage in bargaining strength over a person using this service? (*Tunkl, supra*, 60 Cal.2d at pp. 101-102.)

The present case represents a situation in which public interest and publicly conferred power provide the Federation an insurmountable advantage in bargaining strength against any athlete seeking to participate in amateur bicycle racing at the world-class level.

---

[2]See, e.g., *Vilner* v. *Crocker National Bank* (1979) 89 Cal.App.3d 732, 735-736 [152 Cal.Rptr. 850]; *Gardner* v. *Downtown Porsche Audi, supra*, 180 Cal.App.3d 713, 717; *Pelletier* v. *Alameda Yacht Harbor* (1986) 188 Cal.App.3d 1551, 1556 [230 Cal.Rptr. 253].

### 1. *The Public Interest in World-class Amateur Sports.*

Few would argue with the proposition amateur athletics are important to the health, well-being and enjoyment of most Americans. But that is not a basis for denying enforcement of the exculpatory clauses in this case. As the court correctly pointed out in *Okura* v. *United States Cycling Federation, supra,* 186 Cal.App.3d at page 1467, "There is no compelling public interest in facilitating sponsorship and organization *of the leisure activity of bicycle racing for public participation.*" (Italics added.) Thus, in *Okura,* the court upheld the enforcement of an exculpatory clause, similar to the one signed by plaintiff Buchan, in a negligence action brought by a cycling hobbyist injured in a race conducted by the Federation. The plaintiff in *Okura* was riding in an " 'open' public event" in which "anyone with a bicycle and the entrance fee who desires to enter the event can do so under standards established by the organizers." (*Ibid.*)

The race in which Ms. Buchan was injured was not a "leisure activity" open to anyone "with a bicycle and the entrance fee." Hers was a race between the top cyclists in the country competing for a place on the team which would represent the United States in the world championships later that year which in turn was a step toward a place on the United States Olympic team.

Although at one time amateur sports at the international level was of significance only to individuals with a particular interest in a certain sport, that era has passed. Today, international amateur athletics involve the power and prestige of the United States. Indeed, it was the shortcomings in the nation's performance in such events that led to the Amateur Sports Act of 1978 (36 U.S.C. § 373 et seq.) (See discussion below.) In its final report, the President's Commission on Olympic Sports concluded, "[t]he fact is that *we* are competing less well and *other nations* competing more successfully because other nations have established excellence in international athletics as a national priority." (1 Final Rep. of the President's Comm. on Olympic Sports 1975-1977 (1977), p. ix, italics added.) In support of the act's overhaul of the administration of amateur athletics, Representative Robert Michel observed, "it would be good *for our nation* and for the *athletes who represent us* if the cooperation, spirit of individuality, and personal freedom that are the great virtues of *our system* are allowed to exert their full influence in the [Olympic] games." (124 Cong. Record 31662 (1978), italics added.) The nationalistic aspect of amateur athletics was recognized in *San Fran. Arts & Athletics* v. *U.S.O.C.* (1987) 483 U.S. 522, 537 [97 L.Ed.2d 427, 449, 107 S.Ct. 2971], which concluded "Congress has

a [broad] public interest in promoting . . . the participation of amateur athletes from the United States in [the Olympic Games]."

The public interest in international competition by United States amateur athletes is reflected in the Amateur Sports Act of 1978, *supra*. Among other things, the act created the United States Olympic Committee (U.S.O.C.) (36 U.S.C. § 371) whose "objects and purposes [should] be to [¶] (1) establish national goals for amateur athletic activities and encourage the attainment of those goals; [¶] (2) coordinate and develop amateur athletic activity in the United States directly relating to international amateur athletic competition, so as to foster productive working relationships among sports-related organizations; [¶] (3) exercise exclusive jurisdiction, either directly or through its constituent members or committees, over all matters pertaining to the participation of the United States in the Olympic Games and in the Pan-American Games, including the representation of the United States in such games, and over the organization of the Olympic Games and the Pan-American Games when held in the United States; [¶] (4) obtain for the United States, either directly or by delegation to the appropriate national governing body, the most competent amateur representation possible in each competition and event of the Olympic Games and of the Pan-American Games; [¶] (5) promote and support amateur athletics activities involving the United States and foreign nations; . . ." (36 U.S.C. § 374.)

The U.S.O.C. is authorized to recognize a national governing body for any Olympic sport. "The [U.S.O.C.] shall recognize *only one national governing body* for each sport . . . ." (36 U.S.C. § 391(a).) (Italics added.) A national governing body recognized by the U.S.O.C. "is under a duty to (1) develop interest and participation throughout the United States and be responsible to the persons and amateur sports organizations it represents; . . . [¶] (4) promptly review every request submitted by an amateur sports organization or person for a sanction (A) to hold an international amateur athletic competition in the United States; or (B) to sponsor United States amateur athletes to compete in international amateur athletic competition held outside the United States, and determine whether to grant such sanction, in accordance with the provisions of subsection (b) of this section; . . ." (36 U.S.C. § 392(a).)

The Amateur Sports Act amply demonstrates amateur sports at the international level—the level at which Ms. Buchan was competing—are a matter of great importance to the public.

Furthermore, as evidenced by the Amateur Sports Act, the Federation, as the governing body for amateur cycling in the United States, is engaged in a service Congress thought suitable for public regulation.

The evidence in this case shows the Federation's races are open to racers "coming within certain established standards." (*Tunkl, supra*, 60 Cal.2d at p. 99.) Also, the Federation is prohibited from discriminating on the basis of race, religion, color, age, sex or national origin, (36 U.S.C. § 391(b)(6)), and is under a duty to "provide equitable support and encouragement for participation by women . . . ." (36 U.S.C. § 392(a)(6).)

Therefore, the first, second and third *Tunkl* factors are met.

### 2. *As a Result of Its Monopoly Over World-class Amateur Cycling, the Federation Possesses a Decisive Advantage in Bargaining Strength Over World-class Cyclists.*

The Federation is *the* national governing body for amateur cycling recognized by the U.S.O.C. under the Amateur Sports Act. (36 U.S.C. § 391(a).) As a result, the Federation enjoys a total monopoly over world-class amateur cycling in the United States. A cyclist who wants to participate in Olympic or other international competition can only do so through the Federation.

The Federation has total control over the races it conducts, including the qualifications of the racers. Once a racer like Ms. Buchan entered the World Trials she came under the control of the Federation, subject to the risk of its carelessness. She had no choice over whom she would race against. The decision on who would be allowed to race was in the complete discretion of the Federation.

Ms. Buchan had less bargaining power than the plaintiff in *Gardner* who took his automobile to defendant for repairs. (*Gardner* v. *Downtown Porsche Audi, supra*, 180 Cal.App.3d at p. 719.) There was more than one garage that could have repaired Gardner's Porsche, but there is only one governing body for amateur bicycle racing. If Ms. Buchan was going to compete at the world-class level, the only way to do it was through the Federation.

Therefore, the fourth and sixth *Tunkl* factors are met.

### 3. *The Federation Used Standardized Adhesion Contracts of Exculpation.*

The remaining factor under *Tunkl* is whether, in exercising its superior bargaining power, the party confronts the user of its service with "a standardized adhesion contract of exculpation, and makes no provision whereby

a purchaser may pay additional reasonable fees and obtain protections against negligence." (60 Cal.2d at pp. 100-101, fns. omitted.)

Both of the exculpatory clauses in this case were printed on standardized forms and presented on a take-it-or-leave-it basis. Ms. Buchan was given no opportunity to negotiate or even discuss the terms of the agreements. Furthermore, the Federation has no procedure whereby a racer can pay an extra fee and be protected against the Federation's negligence.

Therefore, the fifth and final *Tunkl* factor is met, and the exculpatory clauses are unenforceable.

By ignoring the unique facts in this case, the majority lumps this case in the same class as cases involving white water rafting (*Saenz* v. *Whitewater Voyages, Inc.* (1990) 226 Cal.App.3d 758 [276 Cal.Rptr. 672]); dirt bike riding (*Kurashige* v. *Indian Dunes, Inc.* (1988) 200 Cal.App.3d 606 [246 Cal.Rptr. 310]); and sky diving (*Hulsey* v. *Elsinore Parachute Center* (1985) 168 Cal.App.3d 333 [214 Cal.Rptr. 194]). Thus, the majority dismisses this case as one involving mere "sport and recreation" and holds as a matter of law the concept of " 'public interest' has no applicability to sports activities." (Maj. op., *ante*, at p. 149.) The majority opinion is contradicted by the factual record in this case developed after a lengthy trial. This factual record was before the trial court when it ruled the exculpatory clauses were unenforceable. The trial court's ruling is fully supported by the record and should be affirmed on this appeal.

Respondent's petition for review by the Supreme Court was denied May 2, 1991.