[No. C013447. Third Dist. Aug. 23, 1993.]

BRAD C. WESTLYE, Plaintiff and Appellant, v.
LOOK SPORTS, INC., et al., Defendants and Respondents.

## COUNSEL

Philip A. Olsen and Charles G. Kinney for Plaintiff and Appellant.

Hancock, Rothert & Bunshoft, Paul S. Rosenlund, Paul E. Fagan, Mark D. Tokunaga and Carin C. Duryee for Defendants and Respondents.

## OPINION

SIMS, J.—Plaintiff Brad C. Westlye fell while snow skiing and was injured, allegedly due to defective ski equipment rented from defendant Klein's Ski Shop (Klein's) and distributed by defendants Look Sports, Inc., Look U.S.A., Inc., and Nordica U.S.A., Inc. (the distributor defendants).[1] Plaintiff filed suit alleging claims of strict products liability, negligence, breach of warranty, breach of contract, misrepresentation, and fraudulent concealment. The trial court granted defendants' motion for summary adjudication on all causes of action except fraudulent concealment, concluding that the claims were barred by a written agreement in which plaintiff accepted the equipment "as is" and expressly assumed the risk of injury. Following trial on the fraudulent concealment claim, plaintiff appeals from the judgment, challenging only the trial court's determination of the summary adjudication motion. We will conclude, among other things, that the written agreement does not bar plaintiff's recovery under a theory of strict products liability in tort. We shall therefore reverse the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff was injured when he fell while skiing at Sugar Bowl ski resort, and the left safety binding failed to release the ski from the boot. Plaintiff

---

[1] Look U.S.A., Inc., is apparently a successor distributor of Look Sports, Inc.

Plaintiff's first amended complaint also named as defendant "BILL KLEIN, individually and dba BILL KLEIN SKI SHOP." In December 1988, the parties filed a stipulation for amendment of complaint, dismissing Bill Klein without prejudice and stipulating to an amendment to substitute the words "Klein's Sport Shop, a limited partnership" for the words "Klein's Ski Shop, a corporation" wherever they appear. Nevertheless, the parties on appeal refer to Klein's Ski Shop.

had rented the ski equipment from Klein's, which had purchased the equipment from the distributors.

The first amended complaint alleged the following causes of action:

1. Strict products liability—based on defective product—against all defendants;

2. Negligence in the design, manufacture, and distribution of the equipment, against all defendants;

3. Negligence in the mounting, maintenance, service, and adjusting of the safety bindings, against Klein's;

4. Breach of express warranties that the binding would release when necessary to prevent injury, against all defendants;

5. Breach of implied warranty that the binding would release when necessary, against all defendants;

6. Breach of contract against Klein's for failing to adjust the binding so it would release when necessary;

7. False representation against the distributor defendants for advertising the bindings as safe;

8. Negligent misrepresentation against the distributor defendants;

9. Intentional misrepresentation against the distributor defendants; and

10. Fraudulent concealment against all defendants for concealing from the public the fact the bindings do not release in all circumstances where release is necessary to prevent injury.

Plaintiff also sought punitive damages.

Defendants filed an answer which included the following affirmative defenses: (1) plaintiff assumed the risk of injury; and (2) plaintiff signed a written agreement expressly releasing defendants from any and all liability

with respect to the use of the ski bindings.[2] The release was contained in the rental agreement between plaintiff and Klein's. A copy of the agreement signed by plaintiff is attached as appendix A. In it, plaintiff (1) accepted the equipment for use "as is"; (2) agreed he understood bindings "will not release under ALL circumstances and are no guarantee for the user's safety"; (3) acknowledged there is "an inherent risk of injury in the sport of skiing, and the use of any ski equipment, and expressly assume[d] the risks for any damages to any persons or property resulting from the use of this equipment"; and (4) agreed to hold Klein's harmless and release Klein's from any and all responsibility or liability for damage and injury "whether resulting from the negligence (active or passive/past, present or future) or whether resulting from the selection, inspection or adjustment of this equipment (active or passive/past, present or future) by [Klein's] and/or its employees or whether resulting from the use of this equipment by the user."

In January 1992, defendants jointly moved for summary judgment or summary adjudication of each cause of action as having no merit. Defendants' motion relied heavily upon the written agreement.[3]

Defendants' motion submitted, and plaintiff in his opposition agreed, that the following facts were undisputed: (1) plaintiff was injured while skiing; (2) he fell and was hurt while using ski equipment rented from Klein's; (3) the accident occurred when plaintiff was skiing down a run, turned to avoid another skier, could not negotiate the turn, and fell because the snow was icy; (4) plaintiff read and signed both sides of the ski rental agreement; (5) the language of the rental agreement was as represented by defendants; and (6) plaintiff was employed as an insurance broker at the time of the accident.

Defendants' motion also made the following assertions, which plaintiff disputed in his opposition: (1) the language of the rental agreement was clear and unambiguous; (2) plaintiff did not rely on any representations or warranties allegedly made by the distributor defendants with regard to the ski bindings; (3) Klein's did not represent or warrant that the bindings would release under all circumstances or would guarantee plaintiff's safety; and (4) the only person plaintiff spoke with at Klein's concerning the signing of the agreement was a clerk behind the rental counter upstairs.

Plaintiff's opposition to the motion also claimed there were three disputed issues: (1) The bindings were defective; (2) the release did not include or

---

[2]Actually, it appears defendant Nordica U.S.A.'s answer did not raise the written agreement as an affirmative defense. The point is moot in this appeal, however, since we will conclude that the distributor defendants failed to show they were covered by the agreement.

[3]Plaintiff also filed his own motion for summary adjudication of certain issues—that the ski bindings were defective, that the release did not apply to the distributor defendants, and that the release did not apply to consumer product defects. On appeal, plaintiff does not challenge the trial court's denial of his motion.

apply to the distributor defendants; and (3) the release did not include or apply to strict products liability for consumer product defects.

In February 1992, the trial court denied the motion for summary judgment because it concluded a triable issue of fact existed with respect to the tenth cause of action for fraudulent concealment (and punitive damages), in that the claim by its nature involved matters unknown to plaintiff at the time he signed the agreement and therefore could not be barred by the release provision. The court granted summary adjudication in favor of defendants on the other nine causes of action.

The court concluded the claims against Klein's were barred by the written agreement signed by plaintiff. As stated by the court in its amended order, "That agreement releases Klein from all liability. The agreement also contains express language by which the plaintiff acknowledged the inherent risk of skiing and assumed the risk of injury. Finally, the agreement acknowledges that plaintiff accepted the equipment 'as is' and understood that the bindings would not release in all circumstances."

As to the distributor defendants, the court concluded the claims for strict liability, negligence, and breach of implied warranty were "barred by the language of the rental agreement regarding plaintiff's assumption of risk, acknowledgement of the inherent risks of skiing, and acceptance of the equipment 'as is.' The express warranty and misrepresentation causes of action are barred because the only express statements relied on by plaintiff were those of Klein's [], not those of the remaining defendants."

In March 1992, the parties proceeded to a court trial on the fraudulent concealment claim. The trial court granted a defense motion for judgment (Code Civ. Proc., § 631.8).

Judgment in favor of defendants was entered on April 7, 1992. Plaintiff appeals from the judgment, challenging only the trial court's decision summarily adjudicating the nine causes of action in defendants' favor.

DISCUSSION

I. *Standard of Review*

In order to establish entitlement to summary adjudication of a cause of action, the moving party defendant must establish that the cause of action is

without merit by negating an essential element or by establishing a complete defense. (Code Civ. Proc., § 437c [hereafter § 437c], subd. (f); *City of Emeryville* v. *Superior Court* (1991) 2 Cal.App.4th 21 [2 Cal.Rptr.2d 826].)[4] A motion for summary adjudication proceeds in all procedural respects as a motion for summary judgment. (§ 437c, subd. (f); *Haskell* v. *Carli* (1987) 195 Cal.App.3d 124, 130 [240 Cal.Rptr. 439].) ▪ On appeal, our review is de novo. (§ 437c; *Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1511-1513 [285 Cal.Rptr. 385].)

As will appear, both sides attempt to inject new facts on appeal. We disregard all asserted facts that were not presented to the trial court during the motion proceedings. (See *Torres* v. *Reardon* (1992) 3 Cal.App.4th 831, 836 [5 Cal.Rptr.2d 52]; *Powell* v. *Standard Brands Paint Co.* (1985) 166 Cal.App.3d 357, 361, fn. 1 [212 Cal.Rptr. 395].)

## II. *The Rental Agreement*

We will begin with the causes of action assertedly affected by the written rental agreement signed by plaintiff—strict products liability, negligence, breach of warranty, and breach of contract. We will then separately address the misrepresentation claims.

▪ In interpreting this written instrument, we conduct a de novo review and make a determination in accordance with applicable principles of law. (*Buchan* v. *United States Cycling Federation, Inc.* (1991) 227 Cal.App.3d 134, 146-147 [277 Cal.Rptr. 887].)

### A. *Inapplicability to Distributor Defendants*

▪ We first consider plaintiff's contention that the written agreement cannot be construed to benefit the distributor defendants, because the agreement was between Klein's and him and did not even mention the distributor

---

[4]As indicated, defendants' motion relied heavily upon establishment of the written agreement as a complete defense. We note that the version of section 437c in effect at the time defendants filed their motion stated only that a cause of action had no merit if one or more of the elements could not be established. (Stats. 1990, ch. 1561, § 2.) The statute did not at that time include the language of the current version of section 437c that a cause of action also has no merit "if there is a complete defense to the cause of action." (Stats. 1992, ch. 1348, § 1.) However, the 1992 amendment did not represent a change in law but merely codified the holding of *City of Emeryville* v. *Superior Court, supra,* 2 Cal.App.4th 21. (Legis. Counsel's Dig., Assem. Bill No. 2616, Stats. 1992 (Reg. Sess.).)

defendants. Plaintiff contends it was error for the trial court to grant summary adjudication to the distributor defendants on the basis of the written agreement.[5] We agree.

It is a basic rule of contract law that "[i]t is essential to the validity of a contract, not only that the parties should exist, but that it should be possible to identify them." (Civ. Code, § 1558.)

Here, the agreement specifies only Klein's and its employees (and nonparty Sugar Bowl) as parties to be protected from liability. Nothing in the rental agreement identifies the distributor defendants as parties to be bound or benefitted by the agreement. Therefore, it was the burden of the distributor defendants to show some basis for extending the agreement to them.

The distributor defendants failed to make any legal argument in the trial court or on appeal that would entitle them to invoke the contract.[6]

Though not cited by defendants, we recognize that in the context of a *post*-event release[7] as to one of several joint tortfeasors, the "ancient common law rule" was that a release of one tortfeasor released all other parties jointly liable, because of the notion that a release extinguished the cause of action itself. (*Zenith Radio Corp.* v. *Hazeltine Research* (1971) 401 U.S. 321, 343-347 [28 L.Ed.2d 77, 94-97, 91 S.Ct. 795]; *Pellett* v. *Sonotone Corp.* (1945) 26 Cal.2d 705, 710-711 [160 P.2d 783, 160 A.L.R. 863].) However, the more modern rule as stated in the Restatement Second of Torts is that a release does not discharge nonparties unless the contracting parties so intend. (*Zenith, supra,* 401 U.S. at pp. 343-347 [28 L.Ed.2d at pp. 94-97] [adopting Restatement rule in antitrust action]; see also Rest.2d Torts, § 885.) The ancient common law rule has been supplanted in California by Code of Civil Procedure, section 877, which provides that where one or more tortfeasors is claimed to be liable for the same tort, a release given to one tortfeasor does not discharge any other tortfeasor from liability "unless its terms so provide." (See *General Motors Corp.* v. *Superior Court*

---

[5]Plaintiff refers to the rental agreement as a "disclaimer form." We eschew this label because we believe its connotation does not encompass the express assumption of risk which is part of the agreement.

[6]In their briefs, defendants do not claim, for example, that they are somehow third party beneficiaries of the contract. Moreover, while a contract need not identify the third party by name, the third party must show that it is one of a class of persons for whose benefit the contract was made. (*General Motors Corp.* v. *Superior Court* (1993) 12 Cal.App.4th 435, 443-444 [15 Cal.Rptr.2d 622].)

[7]"A release may be executed before or after the event giving rise to potential liability . . . ." (17 Schwing, Cal. Practice, Defenses in Civil Actions (1989) §§ 42.1-42.4, pp. 574-583 [pre-event releases subject to closer scrutiny].)

(1993) 12 Cal.App.4th 435 [15 Cal.Rptr.2d 622]; *Barney v. Aetna Casualty & Surety Co.* (1986) 185 Cal.App.3d 966, 983 [230 Cal.Rptr. 215]; *Mayhugh v. County of Orange* (1983) 141 Cal.App.3d 763 [190 Cal.Rptr. 537]; 17 Schwing, *op. cit. supra*, § 42.7, pp. 588-593.) Similarly, Civil Code section 1543 provides: "A release of one of two or more joint debtors does not extinguish the obligations of any of the others, unless they are mere guarantors; nor does it affect their right to contribution from him or her, except as provided in Section 877 of the Code of Civil Procedure."

 Thus, we are unaware of any legal basis for extending the benefit of the written agreement to the distributor defendants, and defendants have failed to cite any authority to support that proposition. They have therefore failed to establish entitlement to summary adjudication on the basis of the written agreement.

The distributor defendants nevertheless contend that as a matter of law an express assumption of risk is good as against the whole world. They thus maintain that they "did not need to be parties to a contract with the plaintiff in order to be relieved of liability under this defense. By expressly assuming all risks of injury or damage which might occur while skiing, plaintiff relieved all potential defendants of liability for damage arising from his skiing and use of the rental ski equipment."

However, defendants fail to submit, and we have not discovered, any authority for this proposition. The doctrine of express assumption of the risk is founded on express agreement. (Prosser & Keeton, Torts (5th ed. 1984) § 68, p. 482; see also *Saenz v. Whitewater Voyages, Inc.* (1990) 226 Cal.App.3d 758, 762 [276 Cal.Rptr. 672]; Rest.2d Torts, § 496B; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1107, p. 519; BAJI No. 4.30 (1992 rev.).) "Although in the academic literature 'express assumption of risk' often has been designated as a separate, contract-based species of assumption of risk . . . , cases involving express assumption of risk are concerned with instances in which, as the result of an express agreement, the defendant owes no duty to protect the plaintiff from an injury-causing risk." (*Knight v. Jewett* (1992) 3 Cal.4th 296, 308, fn. 4 [11 Cal.Rptr.2d 2, 834, P.2d 696], citing Prosser & Keeton on Torts (5th ed. 1984) § 68, p. 496.) Such an agreement, if valid, "operates to relieve the defendant of a legal duty to the plaintiff with respect to the risks encompassed by the agreement . . . ." (*Ibid.*) That express assumption of risk is founded on an express agreement undercuts the distributor defendants' claim that it is good as against the world.

The distributors claim that in *Buchan v. United States Cycling Federation, Inc., supra,* 227 Cal.App.3d 134, a release/assumption of risk agreement was

held to bar a strict products liability action where product suppliers were not named in the agreement. However, in that case the product suppliers were not only unnamed in the agreement, they were unnamed in the lawsuit; hence the issue was not before the court. Thus, *Buchan* involved negligence claims by an injured bicyclist against sponsors of a bicycle race. Her complaint added a cause of action for strict products liability *against Doe defendants* alleging a defective bicycle helmet. However, the only parties before the court were the sponsors of the bicycle race, who were not sued on a products liability theory. Thus, *Buchan* neither considered nor decided whether an express assumption of risk binds persons or entities who are not parties to the agreement.

Moreover, the distributors' argument proves too much. Their interpretation would allow the agreement to apply to persons whom the plaintiff did not intend to relieve of liability and who had no expectation of being relieved of liability toward the plaintiff, e.g., a ski instructor (unaffiliated with the contracting parties) who improperly readjusts the plaintiff's bindings.

We conclude the distributor defendants have failed to establish that they are entitled to the benefit of the written agreement between plaintiff and Klein's. We therefore conclude the trial court erred in granting summary adjudication in favor of the distributor defendants on the causes of action for strict liability, negligence, and breach of implied warranty. This error compels reversal of the judgment as to those defendants.[8] Since the written agreement clearly does apply to Klein's, we proceed to consider whether the agreement bars the specific claims against Klein's.

B. *Application of the Rental Agreement to Klein's*

As indicated, the causes of action against Klein's were (1) strict products liability, (2) negligent design, manufacture, and distribution, (3) negligent adjustment of the ski bindings, (4) breach of express warranty, (5) breach of implied warranty, and (6) breach of contract. The trial court determined that the rental agreement barred all causes of action against Klein's, because in it plaintiff (1) released Klein's from all liability, (2) expressly assumed the risk of injury, and (3) accepted the equipment "as is" and understood that the bindings would not release in all circumstances.

---

[8]We note the trial court's summary adjudication in favor of the distributor defendants on the breach of express warranty claim was based not on the written agreement but on the court's conclusion that the only express statements upon which plaintiff relied were those of Klein's. Plaintiff does not challenge this ruling on appeal or show any basis for reversal as to that cause of action. We therefore see no basis to disturb the trial court's ruling granting summary adjudication in favor of the distributor defendants on the breach of express warranty claim.

### 1. *Negligent Adjustment*[9]

Plaintiff contends the agreement does not bar his third cause of action against Klein's for negligent adjustment of the ski bindings, because (1) the agreement is ambiguous and does not meet the strict requirements necessary to limit liability; (2) the agreement is void because it affects the public interest; and (3) the agreement is an unenforceable contract of adhesion. We will conclude plaintiff's contentions are without merit.

#### a. *Agreement Is Clear*

Plaintiff cites the principle that courts look with some skepticism at those who attempt to contract away their legal liability for the commission of torts. (*Gardner* v. *Downtown Porsche Audi* (1986) 180 Cal.App.3d 713, 716 [225 Cal.Rptr. 757].) ■ Because of the harsh results, a liability-limiting agreement to be effective must be "clear, explicit and comprehensible in each of its essential details." (*Ferrell* v. *Southern Nevada Off-Road Enthusiasts, Ltd.* (1983) 147 Cal.App.3d 309, 318 [195 Cal.Rptr. 90].) In order for an agreement to be effective, " 'it must also appear that its terms were intended by both parties to apply to the particular conduct of the defendant which has caused the harm. Again, where the agreement is drawn by the defendant and the plaintiff passively accepts it, its terms will ordinarily be construed strictly against the defendant.' " (*Bennett* v. *United States Cycling Federation* (1987) 193 Cal.App.3d 1485, 1490 [239 Cal.Rptr. 55], citing Rest.2d Torts, § 496B, com. d, p. 566.) Additionally, the operative language should be placed in a position which compels notice and must be distinguished from other sections of the document. (*Conservatorship of Link* (1984) 158 Cal.App.3d 138, 142 [205 Cal.Rptr. 513].)

■ Plaintiff claims the agreement in this case is unclear and ambiguous because it promises on the one hand that the ski shop will properly adjust the bindings but implies on the other hand that the ski shop will not bear responsibility for its actions. However, we do not find in the written agreement any promise properly to adjust the bindings that would undercut the exculpatory language. The agreement merely states that adjustments are according to manufacturer's recommendations. Thus, the pertinent language states: "It is understood the bindings furnished herewith are bindings designed to reduce the risk or degree of injuries from falling, and that *despite the fact that adjustments are according to manufacturers recommendations*, it is understood that the bindings will not release under ALL circumstances and are no guarantee for the user's safety. . . . [¶] It is further expressly agreed

---

[9]We deal in this part with plaintiff's garden-variety negligence claim against Klein's. We deal *post* with negligence as a theory of products liability.

that the undersigned shall hold the Klein's Ski Shop and/or its employees . . . harmless and release them from any and all responsibility or liability for damage and injury to the equipment user . . . whether resulting from the negligence (active or passive/past, present or future) or whether resulting from the selection, inspection or *adjustment* of this equipment (active or passive/past, present or future) by the Klein's Ski Shop and/or its employees . . . ." (Italics added.)

The agreement does not present conflicting provisions nor is it unclear or ambiguous.

Plaintiff also claims the liability-limiting provisions are ineffective because the language is "buried" in the fourth paragraph on the back of the form, which supposedly appears designed not to be read. We disagree. The front of the form states "PLEASE READ & SIGN THE AGREEMENT ON THE REVERSE OF THIS FORM. LIMITED LIABILITY." At the top of the reverse side of the form, it says "PLEASE READ AND SIGN THIS AGREEMENT—IT RELEASES US FROM LIABILITY." The agreement itself is four short paragraphs of equal size type, each of which stresses the liability-limiting nature of the agreement.

Plaintiff contends the written agreement leaves room for liability, because it states the bindings are designed to reduce the risk of injury, and a binding which fails to release in a fall does not reduce the risk of injury. In other words, plaintiff thinks the agreement is a guarantee against injury. However, the agreement says only that the bindings are designed to *reduce* the risk or degree of injury; it says nothing about *eliminating* the risk or degree of injury.

Plaintiff refers to the contract language that it is understood that the bindings will "not release under ALL circumstances and are no guarantee for the user's safety." Plaintiff argues that this provision cannot be construed as an understanding that the bindings will not always work, because it could be construed to mean that the bindings will not release when they are not supposed to, i.e., that they will not come loose during normal skiing. We do not find the provision susceptible to plaintiff's interpretation, particularly given its context in a sentence that says the bindings are no guarantee of safety.

Plaintiff insists the contract language about bindings being no guarantee of safety merely means that the bindings will not prevent the skier from injury unrelated to performance of the equipment, i.e., the bindings will not prevent the skier from being hit by another skier, from skiing over a cliff,

from falling from a chair lift, or from being trapped in an avalanche. However, the agreement specifies the bindings are designed "to reduce [not eliminate] the risk or degree of injuries *from falling*" but are no guarantee of safety. (Italics added.)

We conclude the agreement is sufficiently clear and specific to be enforceable.

### b. *Public Interest*

■ Plaintiff contends the written agreement cannot bar the negligence action, because disclaimers affecting the public interest will not be upheld. We disagree.

■ "[N]o public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party, . . ." (*Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92, 101 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].) However, "[w]hile no public policy prohibits private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise place on the other party, under Civil Code section 1668,[10] all contracts affecting the public interest which have for their object, directly or indirectly, to exempt anyone from responsibility for his own negligence or injury to the person or property of another are against public policy and void." (*Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 938 [218 Cal.Rptr. 839] [landowners' agreement to discharge water district from liability for flooding damage was void], citing *Tunkl v. Regents of University of California, supra,* 60 Cal.2d at p. 95.)

■ *Tunkl, supra,* 60 Cal.2d 92, held that exculpatory clauses affecting the public interest cannot stand. (*Id.* at p. 98 [release from liability for future negligence imposed on prospective patient as condition of admission to charitable hospital was void].) The Supreme Court acknowledged the difficulty of defining the public interest but noted that courts had identified various characteristics. "Thus the attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of

---

[10]Civil Code section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Id.* at pp. 98-100, citations and fns. omitted.)

Defendants note that courts have consistently declined to apply *Tunkl* to invalidate an exculpatory agreement in the recreational sports context. (*Buchan* v. *United States Cycling Federation, Inc., supra,* 227 Cal.App.3d at pp. 149-154 [bicycle racing], citing inter alia *Madison* v. *Superior Court* (1988) 203 Cal.App.3d 589, 598-599 [250 Cal.Rptr. 299] [scuba diving training course]; *Kurashige* v. *Indian Dunes, Inc.* (1988) 200 Cal.App.3d 606 [246 Cal.Rptr. 310] [motorcycle dirt bike riding]; *Coates* v. *Newhall Land & Farming, Inc.* (1987) 191 Cal.App.3d 1, 8 [236 Cal.Rptr. 181] [same]; *Okura* v. *United States Cycling Federation* (1986) 186 Cal.App.3d 1462 [231 Cal.Rptr. 429] [bicycle racing].) *Okura* noted the type of cases found to affect the public interest: "Measured against the public interest in hospitals and hospitalization, escrow transactions, banking transactions and common carriers, this transaction [bicycle racing] is not one of great public importance. There is no compelling public interest in facilitating sponsorship and organization of the leisure activity of bicycle racing for public participation. The number of participants is relatively minute compared to the public use of hospitals, banks, escrow companies and common carriers. Also, the risks involved in running such an event certainly do not have the potential substantial impact on the public as the risks involved in banking, hospitals, escrow companies and common carriers. The service certainly cannot be termed one that 'is often a matter of practical necessity for some members of the public.' " (186 Cal.App.3d at p. 1467.)

Plaintiff cites *Pelletier* v. *Alameda Yacht Harbor* (1986) 188 Cal.App.3d 1551 [230 Cal.Rptr. 253], which held that a lease agreement for a covered berth for a boat affected the public interest under *Tunkl* because, "[f]or persons with boats, the availability of berths in harbors is a matter of practical necessity." (*Pelletier, supra,* 188 Cal.App.3d at p. 1555.) However,

the type of business itself was of public interest inasmuch as the business of operating private wharfs and piers was subject to regulation under the Harbors and Navigations Code. (*Ibid.*) The ski industry, in contrast, is not subject to comprehensive public regulation.

Plaintiff believes the cases refusing to apply *Tunkl* in the sports context were wrongly decided because they do not recognize the significant public interest in safe recreation. Recreation, says the plaintiff, is not a frivolous activity but one which leads to longer, healthier, and happier lives. Be that as it may, we agree with the foregoing cases that recreational sports do not constitute a public interest under *Tunkl.*

Plaintiff contends this case is distinguishable from the cases rejecting a public interest argument in sports cases, because this case involves rendition of professional services by the ski shop adjusting the ski bindings. We do not find the distinction material.

We conclude the public interest does not prevent enforcement of the agreement in this case to bar the claim against Klein's for negligent adjustment of the bindings.

### c. *Contract of Adhesion*

Plaintiff argues the written agreement is an unenforceable contract of adhesion. However, on the state of this record, the argument has no merit.

An adhesion contract has been defined as " 'a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' [Citation.]" (*Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 817 [171 Cal.Rptr. 604, 623 P.2d 165] [provision in concert promotion contract designating one party's union as arbitrator of any disputes was unconscionable in light of adhesive nature of contract].) "Such contracts are, of course, a familiar part of the modern legal landscape, in which the classical model of 'free' contracting by parties of equal or near-equal bargaining strength is often found to be unresponsive to the realities brought about by increasing concentrations of economic and other power. They are also an inevitable fact of life for all citizens—businessman and consumer alike. While not lacking in social advantages, they bear within them the clear danger of oppression and overreaching. It is in the context of this tension—between social advantage in the light of modern conditions on the one hand, and the danger of oppression on the other—that courts and legislatures have sometimes acted to prevent perceived abuses." (*Id.* at pp. 817-818, fns. omitted.)

However, "[t]o describe a contract as adhesive in character is not to indicate its legal effect. It is, rather, 'the beginning and not the end of the analysis insofar as enforceability of its terms is concerned.' [Citation.] Thus, a contract of adhesion is fully enforceable according to its terms [citations] unless certain other factors are present which, under established legal rules —legislative or judicial—operate to render it otherwise.

"Generally speaking, there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him. [Citations.] The second—a principle of equity applicable to all contracts generally—is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.' [Citations.]" (*Graham*, *supra*, 28 Cal.3d at pp. 819-820, fns. omitted.)

 As noted by plaintiff, it has been said that unconscionability has both a procedural and a substantive element. (*Kurashige* v. *Indian Dunes, Inc.*, *supra*, 200 Cal.App.3d at p. 613.) The procedural element focuses on two factors: oppression and surprise. Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice. (*Ibid.*) Surprise involves the extent to which the terms of the bargain are hidden in a "prolix printed form" drafted by a party in a superior bargaining position. (*Ibid.*) Substantive unconscionability inquires into whether the one-sidedness of an agreement is objectively justified. (*Id.* at pp. 613-614.) This component is tied to procedural unconscionability and requires a balancing test, such that " 'the greater the unfair surprise or inequality of bargaining power, the less unreasonable the risk reallocation which will be tolerated.' "[11] (*Id.* at p. 613.)

*Kurashige* affirmed summary judgment in favor of a dirtbike riding park owner based on a dirtbike rider's release agreement. The plaintiff argued unconscionability in opposing the motion, but there was "no evidence plaintiff could not have ridden his motorcycle elsewhere without the constraints imposed upon him by the defendants." (200 Cal.App.3d at p. 614.) Nor was the risk reallocation objectively unreasonable, because the agreement stated that the signatory knew that the condition of the park could be

---

[11]The Supreme Court has noted that the division of the unconscionability analysis into two elements conforms more closely to the Uniform Commercial Code but should lead to the same result as the common law analysis expressed in *Graham* v. *Scissor-Tail, Inc.*, *supra*. (*Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 925, fn. 9 [216 Cal.Rptr. 345, 702 P.2d 503].)

hazardous and dangerous, and to some extent the risk of injury was dependent on the rider's skill, over which the defendants had no control. (Id. at pp. 614-615.)

Although the determination of unconscionability is a question of law, its resolution turns on the factual circumstances of the case. (*U.S. Roofing, Inc.* v. *Credit Alliance Corp.* (1991) 228 Cal.App.3d 1431, 1450 [279 Cal.Rptr. 533]; see Civ. Code § 1670.5.)[12]

In the case before us, we find nothing objectively unreasonable about the agreement. Plaintiff concedes the issue of conscionability raises a number of factual questions. He cites evidence, presented to the trial court in the motion proceedings, that he had to sign the agreement if he wanted to rent the skis. This evidence (submitted by defendants to show plaintiff's lack of justifiable reliance on alleged misrepresentations) showed that in his deposition plaintiff related the following conversation with a clerk at Klein's: "I said, 'I suppose if I want to rent the skis, I have to sign the agreement?' [¶] And she said, 'That's correct.' [¶] And as I signed it I said, 'In the event that there is some difficulty, this won't do you any good anyway,' to which I believe she asked if I was a lawyer. And I said, 'No.'"

While this evidence may reflect adhesiveness, its says nothing about enforceability of the agreement under the foregoing rules. On appeal, plaintiff asserts "facts" that were not before the trial court in the motion proceedings, attempting to show that it was "impossible" for him to obtain skis at Sugar Bowl other than at Klein's and that "it is impossible for any skier in the United States to [] rent bindings from a ski shop [] without being required to sign an attempted disclaimer form." We will not consider these "facts" (which are of course unsupported by any evidence) because they were not presented in the trial court.[13] (See *Torres* v. *Reardon, supra*, 3 Cal.App.4th at p. 836; *Powell* v. *Standard Brands Paint Co., supra*, 166 Cal.App.3d at p. 361, fn. 1.)

---

[12]Civil Code section 1670.5 provides: "(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause so as to avoid any unconscionable result.

"(b) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination."

[13]In his reply brief, plaintiff claims that defendants' appellate brief concedes that the use of this form is universal among ski rental shops. However, what defendants' brief says is that the only way for persons such as defendants to protect themselves from unlimited liability is to require that their customers sign releases of liability and assumption of risk agreements, such as the agreement used in this case. This does not constitute the concession claimed by plaintiff.

 Plaintiff concedes these facts were not presented during the motion proceedings. He nevertheless argues that it was the moving parties' burden to "eliminate the possibility that the disclaimer agreement could be unenforceable," and therefore he (plaintiff) is entitled to show facts on appeal which, if proved, would render the agreement unenforceable. We disagree.

 The scope of issues material in a summary adjudication motion are delimited by the pleadings, which are supposed to aver the ultimate facts which constitute the cause of action or defense thereto. (*FPI Development, Inc.* v. *Nakashima* (1991) 231 Cal.App.3d 367, 381-382 [282 Cal.Rptr. 508]; *Danieley* v. *Goldmine Ski Associates, Inc.* (1990) 218 Cal.App.3d 111, 119 [266 Cal.Rptr. 749].) We recently said: " '[M]ateriality depends on the *issues in the case*; evidence which does not relate to a matter in issue is *immaterial*.' [Citation.] 'Materiality, i.e., what matters are in issue, "is determined mainly by the pleadings, the rules in pleading and the substantive law relating to the particular kind of case. [Citations.]" ' [Citation.] Therefore, in alleging 'material facts' which the moving party contends are undisputed, it is incumbent upon the moving party to show the materiality of the facts by identifying, in the summary judgment pleadings, how the undisputed facts apply to specific issues raised by the complaint or answer and how they entitle the moving party to judgment as a matter of law." (*Juge* v. *County of Sacramento* (1993) 12 Cal.App.4th 59, 67 [15 Cal.Rptr.2d 598], original italics.)

 Plaintiff's complaint did not mention the written agreement at all. Defendants' answer raised the agreement as an affirmative defense. The matters put in issue by assertion of this defense are (1) genuineness and (2) due execution. (*Cohn* v. *Bugas* (1974) 42 Cal.App.3d 381, 391 [116 Cal.Rptr. 810]; 17 Schwing, Cal. Practice, Defenses in Civil Actions, *op. cit. supra*, § 42.13, p. 597.) Unconscionability is a defense to the defense, i.e., unconscionability may render the agreement unenforceable. (*Dean Witter Reynolds, Inc.* v. *Superior Court* (1989) 211 Cal.App.3d 758, 766 [259 Cal.Rptr. 789] [unconscionability is not an affirmative cause of action]; but cf. *Truta* v. *Avis Rent A Car System, Inc.* (1987) 193 Cal.App.3d 802, 818 [238 Cal.Rptr. 806] [unconscionability as element of statutory claim for unfair business practices].) Contrary to plaintiff's contention, *Dean Witter Reynolds* does not impose on a defendant moving for summary judgment the burden to prove that an agreement is not unconscionable.

We note a recent Fourth District case placed the burden of showing unconscionability on the plaintiff opposing a defense motion for summary judgment. (*General Motors Corp.* v. *Superior Court, supra,* 12 Cal.App.4th

at pp. 439, 443.) In that products liability case arising from a car accident, the appellate court held that since the plaintiff had failed to present evidence sufficient to raise a triable issue regarding unconscionability, the defendant/car manufacturer was entitled to summary judgment based on a post-accident release between the plaintiff and the other driver which expressly released not only the other driver but also " 'any and all person[s], firms and corporations, whether herein named or referred to or not.' " (*Id.* at p. 439.)

Thus, we believe it was plaintiff's burden to raise the unconscionability issue in the trial court.

Seeking to shift the burden to defendants, plaintiff relies on California Uniform Commercial Code section 2719, which provides that in a sale of goods a limitation on personal injury damages is invalid unless proved that it is not unconscionable.[14] Plaintiff argues defendants therefore had the burden of disproving unconscionability in their moving papers. However, that statute, as part of the sales act, applies only to sales transactions. (Cal. U. Com. Code, § 2106, subd. (1).) This case involves a rental, not a sale. Plaintiff proposes no reason why a statute governing sales transactions should apply to a contractual release of liability from negligence in the rendition of a service (adjustment of ski bindings) connected with a rental transaction. Moreover, a general unconscionability provision was enacted by our Legislature but was placed in the Civil Code so as to govern *all* contracts rather than in the Commercial Code's limited sphere of sales contracts. (*U.S. Roofing, Inc.* v. *Credit Alliance Corp., supra*, 228 Cal.App.3d at pp. 1447-1448; *A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473, 484-485 [186 Cal.Rptr. 114, 38 A.L.R.4th 1].) That general provision, adopted verbatim from the Uniform Commercial Code, is now found in Civil Code section 1670.5 (fn. 12, *ante*). Thus, we believe plaintiff's interests are sufficiently protected without seeking some justification to extend the California Uniform Commercial Code beyond its scope.[15]

Had plaintiff anticipated the defense of the release agreement in his complaint and alleged facts suggesting unconscionability, the matter would have been a material issue which defendants would have had to refute in

[14]California Uniform Commercial Code section 2719, subdivision (3), provides in part: "Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is invalid unless it is proved that the limitation is not unconscionable. . . ."

[15]Though plaintiff does not cite *A & M Produce Co., supra*, 135 Cal.App.3d 473, we note the court there stated the burden should be on the party submitting a standard preprinted contract to show that the other party had knowledge of any unconscionable terms contained therein. (*Id.* at p. 490.) Here, it is undisputed that plaintiff had knowledge of all terms contained in the rental agreement when he signed it.

order to obtain summary adjudication. Thus, in *Conn* v. *National Can Corp.* (1981) 124 Cal.App.3d 630 [177 Cal.Rptr. 445], employees brought an action against their employer and their union to litigate employment rights. In anticipation of the defense of failure to exhaust contractual remedies in the collective bargaining agreement through internal grievance procedures, the employees alleged in their complaint that the union had breached its duty of fair representation. (*Id.* at pp. 633-634.) The defendants' failure to meet these allegations precluded summary judgment. "If . . . the plaintiff pleads several theories or anticipates affirmative defenses by a show of excusing events or conditions, the challenge to the opponent is made by the complaint, requiring the moving defendant to affirmatively react to each theory *and* excusing or justifying event, or condition which supports a theory, if the motion is to be successful."[16] (*Id.* at p. 639, original italics.)

Since plaintiff's complaint said nothing about the agreement, the matter of adhesiveness/unconscionability was not a material issue for purposes of defendants' initial showing on its motion for summary adjudication. Klein's met its initial burden by adducing evidence of the rental agreement and plaintiff's execution. The burden thereafter shifted to plaintiff to raise a triable issue of material fact. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1065 [225 Cal.Rptr. 203].)

Plaintiff could have raised in the trial court the factual matters he seeks to present on appeal, thereby making unconscionability a material issue which might have precluded summary adjudication if those facts were disputed. However, plaintiff did not do so.

We conclude Klein's established the written agreement as a bar to plaintiff's third cause of action for negligent adjustment.[17]

## 2. *Breach of Contract Claim*

 Plaintiff claims the trial court erred in summarily adjudicating his claim that Klein's breached a contract to safely adjust the

---

[16]Plaintiff cites *Conn* as supposed authority for the presentation of new facts on appeal. *Conn* said: "Summary judgments are reversible on the finding of factual issues based on inferences first drawn by the appellate court." (124 Cal.App.3d at p. 637.) This statement does not authorize new evidence on appeal.

[17]Plaintiff raises issues about the assumption of risk aspect of the written agreement. He argues there was no assumption of risk because the circumstances of the transaction reveal an expectation that Klein's would act carefully in supplying the ski equipment, i.e., plaintiff had to provide Klein's with his height, weight, and skiing ability, and Klein's instructed him not to adjust the equipment himself but to return to the ski shop. We do not find the argument persuasive. Moreover, the release provision of the rental agreement provides a bar to the action independent of express assumption of risk.

bindings. This argument is based on the same contentions we have already rejected in connection with the negligence cause of action, e.g., that the agreement is ambiguous. We therefore conclude the agreement bars the breach of contract cause of action.

### 3. *Strict Products Liability*

We turn now to strict products liability.

"The doctrine of strict liability had its genesis in a concurring opinion by Justice Roger Traynor in *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 461 [150 P.2d 436]. He suggested that a manufacturer should be absolutely liable if, in placing a product on the market, it knew the product was to be used without inspection, and it proved to have a defect that caused injury. The policy considerations underlying this suggestion were that the manufacturer, unlike the public, can anticipate or guard against the recurrence of hazards, that the cost of injury may be an overwhelming misfortune to the person injured whereas the manufacturer can insure against the risk and distribute the costs among the consuming public, and that it is in the public interest to discourage the marketing of defective products. [The California Supreme Court] unanimously adopted Justice Traynor's concept in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], holding a manufacturer strictly liable in tort and using the formulation of the doctrine set forth in *Escola.*

■■■ "Strict liability differs from negligence in that it eliminates the necessity for the injured party to prove that the manufacturer of the product which caused injury was negligent. It focusses not on the conduct of the manufacturer but on the product itself, and holds the manufacturer liable if the product was defective." (*Brown* v. *Superior Court* (1988) 44 Cal.3d 1049, 1056 [245 Cal.Rptr. 412, 751 P.2d 470].)

■■■ Strict products liability applies to lessors of a product (who are in the business of leasing), such as Klein's.[18] Thus, the Supreme Court stated in *Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245 [85 Cal.Rptr. 178, 466 P.2d 722]: "[W]e can perceive no substantial difference between *sellers* of personal property and *non-sellers*, such as bailors and lessors. In each instance, the seller or non-seller 'places [an article] on the market, knowing that it is to be used without inspection for defects, . . .' [Citation.] In the light of the policy to be subserved, it should make no difference that the party distributing the article has retained title to it. Nor can we see how the risk of harm

---

[18]Here, Klein's apparently does not dispute that it is in the business of leasing ski equipment.

associated with the use of the chattel can vary with the legal form under which it is held. Having in mind the market realities and the widespread use of the lease of personalty in today's business world, we think it makes good sense to impose on the lessors of chattels the same liability for physical harm which has been imposed on the manufacturers and retailers. The former, like the latter, are able to bear the cost of compensating for injuries resulting from defects by spreading the loss through an adjustment of the rental." (*Id.* at pp. 251-252, original italics.)

The *Price* court reiterated that "Lessors of personal property, like the manufacturers or retailers thereof, are engaged in the business of distributing goods to the public. They are an integral part of the overall . . . marketing enterprise that should bear the cost of injuries resulting from defective products. [Citation.] In some cases the lessor may be the only member of that enterprise reasonably available to the injured plaintiff [], and the imposition of strict liability upon him serves, as in the case of the retailer, as an incentive to safety. [] This will afford maximum protection to the injured plaintiff while working no injustice upon the lessor: the latter can recover the cost of the protection by charging for it in his business. [Citation.]" (2 Cal.3d at p. 252, internal quotations omitted, citing *McClaflin* v. *Bayshore Equipment Rental Co.* (1969) 274 Cal.App.2d 446, 452 [79 Cal.Rptr. 337].)

Thus, strict products liability applies to Klein's as the product's lessor. ▮▮▮ ▬ ▮▮ ▮▮▮ Since defendants did not establish the absence of product defect as a ground for their motion, we assume for purposes of this appeal that the ski binding was defective.[19] Additionally, since we will conclude that a product supplier's attempt to contract away strict liability in tort is void as against the public interest, we need not address plaintiff's contention that the agreement's omission of express reference to injury caused by defective products renders the agreement inoperative to bar strict products liability in tort. For purposes of this appeal, we will assume that the rental agreement does encompass injuries from defective products.

---

[19]Defendants point to the supposed absence of any evidence of product defect at trial. They claim we can use this evidentiary void to conclude that any error by the trial court in granting summary adjudication was harmless. We agree with the general proposition that facts found by the trial court following trial may be relevant to the question whether error in a pretrial ruling was prejudicial so as to warrant reversal of the judgment. (*Waller* v. *TJD, Inc.* (1993) 12 Cal.App.4th 830 [16 Cal.Rptr.2d 38].) However, the sole claim being litigated at trial was fraudulent concealment. Plaintiff's theory was that Klein's concealed from him its failure to perform certain tests on the equipment. Plaintiff was not required to prove product defect at trial, because that issue had been removed from the case by defendants' successful motion for summary adjudication on all claims requiring proof of product defect. (§ 437c, subd. (m), formerly subd. (f) [issues summarily adjudicated shall be deemed established at subsequent trial of remaining issues].)

### a. *Agreement Relieving Product Supplier From Strict Products Liability in Tort Is Void*

Plaintiff argues that no written agreement can operate to allow a supplier of defective products to avoid strict products liability.[20] We agree.

### i. *Limitation on Contractual Disclaimers to Avoid Strict Products Liability*

The doctrine of strict products liability in tort was created partly due to inadequacies of alternate theories of products liability. "An important early step in the development of the law of products liability was the recognition of a manufacturer's liability in negligence to an ultimate consumer without privity of contract. [Citation.] About the same time, the courts began to hold manufacturers liable without negligence for personal injuries. Over a score of theories were developed to support liability [citation], and the one that was generally accepted was borrowed from the law of sales warranty. [Citation.] 'Only by some violent pounding and twisting,' however, could the warranty doctrine be made to serve this purpose. [Citations.] Final recognition that 'The remedies of injured consumers ought not to be made to depend upon the intricacies of the law of sales' [citations] caused [the California Supreme Court] to abandon the fiction of warranty in favor of strict liability in tort. [Citations.]" (*Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9, 15 [45 Cal.Rptr. 17, 403 P.2d 145]; see also *Anderson* v. *Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 994 [281 Cal.Rptr. 528, 810 P.2d 549] [strict products liability relieves injured plaintiff of evidentiary burdens inherent in negligence case].)

The doctrine of strict liability in tort has served to avoid contractual provisions by which product suppliers sought to disclaim responsibility for injuries caused by defective products. (*Seely* v. *White Motor Co., supra*, 63 Cal.2d at pp. 16-17; *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 263 [37 Cal.Rptr. 896, 391 P.2d 168]; *Greenman* v. *Yuba Power Products, Inc., supra*, 59 Cal.2d at p. 63; *Dart Transportation Service* v. *Mack Trucks, Inc.* (1970) 9 Cal.App.3d 837, 849 [88 Cal.Rptr. 670]; Rest.2d Torts,

---

[20]Though not challenged by defendants, we note this contention goes a bit beyond plaintiff's opposition in the trial court, which focussed on arguing that the particular agreement in this case did not extend to product defects. Although plaintiff's opposition broadly stated that product suppliers "cannot limit or abrogate [ ] strict liability by contract," that assertion appeared under the heading that "the distributors cannot avoid strict liability with a general negligence release." However, the contention may be appropriately considered on appeal insofar as it presents only a question of law. (*Hittle* v. *Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 391, fn. 10 [216 Cal.Rptr. 733, 703 P.2d 73].)

§ 402A, com. m; Cotchett & Cartwright, Cal. Products Liability Actions (rev. ed. 1982), § 5.03[8], p. 5-28.)

Thus, in *Vandermark v. Ford Motor Co., supra,* 61 Cal.2d 256, a car dealer's sales contract contained a warranty clause limiting liability to replacement of parts. The Supreme Court held the dealer could not thereby disclaim liability for personal injuries caused by a defect in the car. "Since [the dealer] is strictly liable in tort, the fact that it restricted its contractual liability to [plaintiff] is immaterial. Regardless of the obligations it assumed by contract, it is subject to strict liability in tort because it is in the business of selling automobiles, one of which proved to be defective and caused injury to human beings." (*Id.* at p. 263.)

*Greenman v. Yuba Power Products, Inc., supra,* 59 Cal.2d 57, held that a consumer injured by a defective power tool could recover despite failure to give the manufacturer timely notice of breach of warranty. (*Id.* at p. 60.) The procedural requirements of a warranty claim did not defeat strict products liability in tort. The court said: "Although [] strict liability has usually been based on the theory of an express or implied warranty running from the manufacturer to the plaintiff, the abandonment of the requirement of a contract between them, the recognition that the liability is not assumed by agreement but imposed by law [citations], and *the refusal to permit the manufacturer to define the scope of its own responsibility for defective products* [citations] make clear that the liability is not one governed by the law of contract warranties but by the law of strict liability in tort. Accordingly, rules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturer's liability to those injured by its defective products unless those rules also serve the purposes for which such liability is imposed. [¶] . . . The purpose of [strict products] liability is to insure that the cost of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Id.* at p. 63, italics added.)[21]

*Seely v. White Motor Co., supra,* 63 Cal.2d 9, upheld a consumer's recovery for property damage to a truck manufactured by the defendant and

---

[21]We note plaintiff also cites *Dart Transportation Service v. Mack Trucks, Inc., supra,* 9 Cal.App.3d 837, which held a nonspecific indemnity clause in a truck lease agreement did not indemnify the manufacturer against strict products liability under the circumstances of the case, e.g., the manufacturer had full insurance coverage for products liability and was presumably aware it could not abrogate such liability by contract, and the manufacturer's attorney admitted to the trial court that the parties in their agreement had not contemplated such claims. Because the *Dart* decision turned on the particular facts of the case, we do not find it helpful here.

We also note that *Seely, Vandermark,* and *Greenman* were distinguished in *Kaiser Steel Corp. v. Westinghouse Elec. Corp.* (1976) 55 Cal.App.3d 737 [127 Cal.Rptr. 838], which held that the doctrine of strict products liability in tort did not apply as between parties (the

for economic loss to the plaintiff under a theory of breach of express warranty.[22] (*Id.* at p. 13.) Although the sales contract contained a disclaimer, the defendant's repeated promises to correct the defect supported the breach of warranty theory. (*Id.* at p. 14.) The court went on to state that even without a warranty theory, the defendants would be liable for the property damage (but not the plaintiff's lost profits) under a theory of strict products liability in tort, a liability which "could not be disclaimed, for one purpose of strict liability in tort is to prevent a manufacturer from defining the scope of his responsibility for harm caused by his products."[23] (*Id.* at p. 17.)

The Restatement Second of Torts, which plaintiff also cites, contains a comment stating as follows regarding strict products liability of product suppliers: "The consumer's cause of action does not depend upon the validity of his contract with the person from whom he acquires the product, and it is not affected by any disclaimer or other agreement, whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the consumer's hands." (Rest.2d Torts, § 402A, com. m, p. 356.)

The backdrop of the rule invalidating disclaimers is well stated in Prosser, *Strict Liability to the Consumer in California* (1966) 18 Hastings L. J. 9, 46-48 (fns. omitted), as follows:

"The Uniform Sales Act provided that any warranty, express or implied, could be disclaimed by the seller at the time of the sale; and this has been retained in a somewhat modified form in the Uniform Commercial Code. Commercially a disclaimer may not be at all an unreasonable thing, particularly where the seller does not know the quality of what he is selling, and the buyer is willing to take his chances. 'As is' sales are common and reasonable enough. Even so a rather dangerous power of·abuse is placed in

manufacturer of an electric motor and the owner of a steel mill) who dealt in a commercial setting from positions of relatively equal economic strength, bargained the specifications of the product, and negotiated the risk of loss from defects in the product. (*Id.* at pp. 746-748.) Because the Legislature through adoption of the California Uniform Commercial Code had defined liability for defective products in situations covered by the code, and because the law of sales was adequate in the case before the court, there was no need to resort to tort law. (*Ibid.*) *Kaiser* is of no help in this case, where the law of sales does not apply.

[22]*Seely* applied the law of sales, now found in California Uniform Commercial Code sections 2101 et seq. Although plaintiff in this case cites the Commercial Code, defendants note the provisions apply only to the *sale* of goods (Cal. U. Com. Code, § 2106, subd. (1)), and hence are inapplicable here, where plaintiff merely rented the ski equipment.

[23]Defendants cite *Seely*'s statement that "Had defendant not warranted the truck, but sold it 'as is,' it should not be liable for the failure of the truck to serve plaintiff's business needs." (63 Cal.2d at p. 16.) However, this statement merely means that the product supplier could limit its liability for economic losses (lost profits) under warranty law.

the hands of the seller, which the courts have done what they could to obviate, either by construing away the disclaimer, or by finding that it was not brought home to the buyer, or in an extreme case by refusing to enforce it as a matter of 'natural justice and good morals.'

"It is another matter to say that a consumer who buys at retail is to be bound by a disclaimer which he has never seen, and to which he could certainly not have agreed if he had known of it, but which defeats a duty imposed by the policy of the law for his protection. And when the disclaimer is handed to him with the product, all reality of consent to accede to it is lacking. Obviously if the opportunity is to remain open to the seller to frustrate that policy completely by adding such words as 'Not Warranted in Any Way' to the label on the package, it may be anticipated that there will be those who take advantage of it.

"It was to be expected that this would not be tolerated. In the leading *Henningsen* case [*Henningsen* v. *Bloomfield Motors, Inc.* (1960) 32 N.J. 358 (161 A.2d 69)] the New Jersey court invalidated the standard automobile 'warranty,' in itself a disclaimer of almost all liability of any consequence, as a contract of adhesion not in reality involving any bargaining or freedom of consent, as unfair to the consumer, and as against the policy of the law in promoting human safety. Other courts have since agreed. The elimination of 'warranty,' and the recognition of outright strict liability in tort provided a way around the statutes, and afforded an additional justification for refusing to enforce the manufacturer's disclaimer."

California courts have cited the *Henningsen* case (*Henningsen* v. *Bloomfield Motors, Inc.* (1960) 32 N.J. 358 [161 A.2d 69]) for the rule that contractual disclaimers do not defeat strict products liability in tort. (E.g., *Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d at p. 63.)

We conclude the purported contractual disclaimer in the written rental agreement does not insulate Klein's from strict products liability in tort.

This case is different from the foregoing authorities, however, because the agreement contains not only a disclaimer by the product supplier but an express assumption of risk by the consumer. That brings us to the question whether express assumption of risk can bar a claim of strict products liability in tort.

ii. *Express Assumption of Risk Does Not Defeat Strict Products Liability*

". . . California cases uniformly have recognized that so long as an express assumption of risk agreement does not violate public policy [citation], such an agreement operates to relieve the defendant of a legal duty to

the plaintiff with respect to the risks encompassed by the agreement and, where applicable, to bar completely the plaintiff's cause of action. [Citation.]" (*Knight* v. *Jewett, supra,* 3 Cal.4th at p. 309, fn. 4.)

We have found no California cases addressing the question before us, i.e., whether any public policy invalidates an express assumption of risk agreement by a consumer to relieve a product supplier from strict liability in tort for injuries caused by defective products.

There is a public policy in this state to protect consumers from injuries caused by defective products. (*Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725 [144 Cal.Rptr. 380, 575 P.2d 1162]; *Price* v. *Shell Oil Co., supra,* 2 Cal.3d 245; *Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57.) There is a "strong judicial concern for the rights of consumers of goods and services against whom unexpected and oppressive provisions of standardized contracts are sought to be enforced." (*Wheeler* v. *St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 355 [133 Cal.Rptr. 775, 84 A.L.R.3d 343] [patient's agreement to arbitrate did not bar medical malpractice suit under circumstances of case].)

Moreover, as we have seen, there is a strong policy against allowing product suppliers to disclaim liability for injuries caused by defects in products they place on the market. To allow product suppliers to achieve this prohibited result merely by substituting assumption of risk language for disclaimer language would too easily allow circumvention of these policies. In effect, such an agreement is nothing more than a disclaimer in another form. Were we to enforce such agreements, we would revisit the problems that led to the rule invalidating contractual disclaimers in the first place.

We conclude that, as a matter of public policy, product suppliers cannot insulate themselves from strict liability in tort for injuries caused by defects in products they place on the market by obtaining a consumer's signature on an express assumption of risk.

Accordingly, we conclude the written agreement in this case does not bar plaintiff's cause of action for strict products liability in tort, and the judgment must be reversed as to Klein's.

### 4. *Alternative Products Liability Counts*

We now turn to other counts where liability is alleged against Klein's on products liability theories other than strict products liability.

### a. *Negligence*

■ The second cause of action alleged negligence in the design, manufacture, and distribution of the ski equipment against all defendants. However, it is conceded that Klein's did not design or manufacture the product.

The application of a negligence theory to Klein's in this case would be as follows: A lessor of an article has a duty to use reasonable care to make it safe for its intended use or to disclose its actual condition to the lessee. (*McNeal* v. *Greenberg* (1953) 40 Cal.2d 740, 741-742 [255 P.2d 810]; see also Civ. Code, § 1955.)

However, plaintiff does not address negligence in this context; his discussion of negligence on appeal is limited to negligent adjustment of the bindings.

We therefore conclude plaintiff has failed to demonstrate error on appeal, and summary adjudication in favor of Klein's on the second cause of action was properly entered.

### b. *Breach of Express and Implied Warranty*

■ As indicated, plaintiff's fourth and fifth causes of action alleged breach of express and implied warranties against all defendants. The trial court determined the written agreement barred these counts as against Klein's. We agree with the trial court that the written agreement on its face exculpates Klein's from any liability for breach of warranty.

On appeal, plaintiff concedes that warranty liability may be disclaimed. (See, e.g., *Vandermark* v. *Ford Motor Co., supra*, 61 Cal.2d at pp. 262-263; *Burr* v. *Sherwin Williams Co.* (1954) 42 Cal.2d 682, 683 [268 P.2d 1041].)

Nevertheless, plaintiff again seeks to rely on California Uniform Commercial Code section 2719 (fn. 14, *ante*) to place the burden on Klein's to prove that the exculpatory agreement is not unconscionable. We have rejected plaintiff's reliance on the Commercial Code, which governs only sales transactions (Cal. U. Com. Code, § 2106), in our discussion of plaintiff's garden variety negligence claim against Klein's. We note that courts have invoked Commercial Code *warranty definitions* in common law actions where those definitions provide appropriate standards for the court to adopt under the circumstances. (*Greenman* v. *Yuba Power Products, Inc., supra*, 59 Cal.2d at p. 61.) However, since invalidation of unconscionable contracts is adequately covered by the common law and by Civil Code section 1670.5

(fn. 12, *ante*), which is applicable to all contracts, we see no reason, and plaintiff proposes none, to extend Commercial Code section 2719, governing sales transactions, to this rental agreement.

Plaintiff also contends the exculpatory language of the rental agreement is inconsistent with express promises assertedly contained therein. He cites California Uniform Commercial Code section 2316, which provides that words of limitation are inoperative if they cannot be reasonably construed as consistent with express warranties. However, the Commercial Code does not apply to this rental. Moreover, as we have explained (*ante*, pp. 1731-1732), we see no inconsistency in the written agreement.

Plaintiff argues that the phrase about Klein's readjusting the bindings for free is reminiscent of *Seely*, *supra*, 63 Cal.2d 9, where a truck dealer's express warranty was manifested by its acceptance of responsibility to correct a problem the owner was experiencing with the truck. However, in *Seely* the purchase order contained the express promise that the dealer " 'hereby warrants each new motor vehicle sold by it to be free from defects in material and workmanship under normal use and service, . . .' " (*Id.* at p. 13.) Over a period of 11 months, the buyer returned the truck to the dealer several times, and the dealer several times tried to correct the problem. (*Ibid.*) We see no similarity between *Seely* and this case, where here we have neither an affirmation that the ski equipment was free of defects nor an acceptance of responsibility by an attempt to correct a defect.

We conclude plaintiff has failed to demonstrate error on appeal, and summary adjudication in favor of Klein's on the fourth and fifth causes of action was properly entered.[24]

Having disposed of all causes of action affected by the written agreement, we now turn to the deceit claims alleged against the distributor defendants.

---

[24]We note defendants' assertion that if Klein's is not liable under a warranty theory, the distributor defendants are not liable, because they did not deal directly with plaintiff and were "entitled to rely upon [Klein's] to relay the warnings to ski rental customers." They cite our decision in *Persons* v. *Salomon North America, Inc.* (1990) 217 Cal.App.3d 168 [265 Cal.Rptr. 773], where we held that the manufacturer of rented ski bindings (which were incompatible with the thermoplastic ski boots the plaintiff owned) had no effective way to convey product warnings to the ultimate consumer and could therefore rely on the "downstream" product suppliers, i.e., the ski rental shop, to do so. (*Id.* at pp. 176-179.) However, the theory of defectiveness in that case was that the product was dangerous because it lacked adequate warnings. (*Id.* at p. 174.) Here, plaintiff makes claims of defective design and manufacture.

Moreover, insofar as defendants are referring to the *express* warranty claim, we have already determined that summary adjudication in favor of the distributor defendants on that cause of action was proper on the ground that any express warranties were made by Klein's, not the distributor defendants. (See fn. 9, *ante*.)

III. *Misrepresentation*

Plaintiff contends defendants failed to establish the absence of a triable issue of fact regarding the deceit claims. We agree as to one of the three causes of action.

Plaintiff's claims for false representation, negligent misrepresentation, and intentional misrepresentation are against the distributor defendants only. All three claims are based on allegations that "defendants have engaged in an advertising campaign, advertising the safety bindings . . . in various media, including magazines of general circulation, ski magazines, brochures, pamphlets, posters, radio, and television. Further, defendants annually publish a technical manual for distribution to their dealers containing information to be passed on to consumers. . . . Defendants' advertisements have represented that the safety bindings . . . are safe and that they release easily long before injury to the leg, and that they are superior to the safety bindings of other manufacturers."

The complaint alleged that these representations were false and that "[i]n selecting the safety bindings plaintiff used on the occasion of his injuries, plaintiff and the lessors thereof acted in response to the advertising campaign and representations of defendants."

As to all three deceit claims, defendants rest on their evidence that plaintiff never saw or relied on any advertising by them. As indicated, the trial court granted summary adjudication on the misrepresentation claims on the ground that "the only express statements relied on by plaintiff were those of Klein's [], not those of the remaining defendants."

However, this evidence does not dispose of all three deceit claims. We consider each of the three causes of action separately.

A. *False Representation*

■ Plaintiff's claim of false representation relies on common law tort principles reflected in section 402B of the Restatement Second of Torts, establishing liability for injuries caused by justifiable reliance on false advertising. (*Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 111 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282].) The Restatement provides that "[o]ne engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable

reliance upon the misrepresentation, even though [¶] (a) it is not made fraudulently or negligently, and [¶] (b) the consumer has not bought the chattel from or entered into any contractual relation with the seller." (Rest.2d Torts, § 402B.)

However, "[t]he reliance need not necessarily be that of the consumer who is injured. It may be that of the ultimate purchaser of the chattel [in this case Klein's] who because of such reliance passes it on to the consumer who is in fact injured, but is ignorant of the misrepresentation." (Rest.2d Torts, § 402B, com. j., p. 362.)

Here, Klein's purchased the ski equipment and passed it on to plaintiff. The complaint alleged that *Klein's* relied on the distributor defendants' advertising. Defendants adduced no evidence to establish the absence of a triable issue on this point. Accordingly, summary adjudication was improper on the seventh cause of action for false representation.[25]

### B. *Negligent Misrepresentation*

Plaintiff contends summary adjudication on the eighth cause of action for negligent misrepresentation was improper because Civil Code section 1668 (discussed *ante*) voids release agreements that purport to exculpate fraud. However, the basis for summary adjudication on the misrepresentation claims was not the written agreement but the absence of any representation by the distributor defendants to plaintiff and the absence of any reliance by plaintiff on the distributor defendants.

Negligent misrepresentation is a form of deceit. (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 676, p. 126.) Reliance is an essential element of this cause of action. (*Wilhelm* v. *Pray, Price, Williams & Russell* (1986) 186 Cal.App.3d 1324, 1331-1332 [231 Cal.Rptr. 355].)

Defendants submitted to the trial court the following excerpt from plaintiff's deposition:

"Q. Had you ever seen any advertisements for Look bindings before you had your accident at Sugar Bowl?

---

[25]Defendants' brief on appeal treats the three deceit claims jointly. They cite *Archuleta* v. *Grand Lodge etc.* (1968) 262 Cal.App.2d 202, 208-209 [68 Cal.Rptr. 694], for the proposition that in an action for fraud a plaintiff must specifically plead the details of the representation, e.g., the names of the persons who made the allegedly fraudulent representations and their authority to speak. However, since this cause of action is based on advertisements and a published technical manual distributed to dealers, those pleading requirements do not apply. We believe the complaint is sufficiently specific.

"A. Not specifically.

"Q. Do you have any recollection at all of seeing Look advertisements before you had your accident at Sugar Bowl?

"A. I recall seeing Sugar Bowl advertisements. Is that Look advertisements?

"Q. I am talking about advertisements for Look ski bindings.

"A. Not that I specifically recall.

"Q. What do you mean by that?

"A. Well, I am sure that I have seen advertisements. Whether they were for Look or Nordica or Salomon, I wouldn't have been able to discern that much from names, because they were just names.

"Q. Had you ever read any such advertisements?

"A. I don't know."

We believe defendants sufficiently established the absence of reliance on any representation by the distributor defendants.

In opposition to the motion, plaintiff claimed there was a disputed issue, but supported that claim only by his deposition testimony that he relied on Klein's to comply with his request for bindings that would release easily. This raises no triable issue of material fact as to the misrepresentation claim against the distributor defendants.

We conclude summary adjudication was properly granted on plaintiff's eighth cause of action for negligent misrepresentation against the distributor defendants.

### C. *Intentional Misrepresentation*

For the reasons stated in connection with the negligent misrepresentation claim, we conclude the trial court properly granted summary adjudication on plaintiff's ninth cause of action for intentional misrepresentation against the distributor defendants.

### CONCLUSION

In summary, plaintiff is left at the end of this appeal with the following causes of action: (1) strict products liability against all defendants; (2)

negligent design/manufacture/distribution against the distributor defendants only; (3) breach of implied warranty against the distributor defendants only; and (4) false representation against the distributor defendants.

### DISPOSITION

The judgment is reversed. The trial court is instructed to vacate its order on defendants' motion for summary judgment/summary adjudication and enter a new order as follows:

As to all defendants, the motion for summary judgment is denied.

As to the distributor defendants, defendants' motion for summary adjudication is *granted* as to the fourth cause of action (breach of express warranty), eighth cause of action (negligent misrepresentation), and ninth cause of action (intentional misrepresentation). Defendants' motion for summary adjudication is *denied* as to the distributor defendants on the first cause of action (strict products liability), second cause of action (negligent design, manufacture, distribution), fifth cause of action (breach of implied warranty), seventh cause of action (false representation), and tenth cause of action (fraudulent concealment).

As to defendant Klein's, defendants' motion for summary adjudication is *granted* as to the second cause of action (negligent design/manufacture/distribution), third cause of action (negligent mounting/maintenance/service/adjustment), fourth cause of action (breach of express warranty), fifth cause of action (breach of implied warranty), and sixth cause of action (breach of contract). Defendants' motion for summary adjudication as to Klein's is *denied* as to the first cause of action (strict products liability), and tenth cause of action (fraudulent concealment).

The trial court is further directed to reinstate its order granting defendants' motion for judgment on the tenth cause of action for fraudulent concealment.

The parties will bear their own costs on appeal.

Sparks, Acting P. J., Scotland, J., concurred.

A petition for a rehearing was denied September 15, 1993, and respondents' petition for review by the Supreme Court was denied November 24, 1993. Panelli, J., and Baxter, J., were of the opinion that the petition should be granted.

APPENDIX

## KLEIN'S SKI SHOP
PLEASE FILL OUT SHADED AREAS ONLY AND SIGN BACK

SUGAR BOWL • NORDEN, CALIFORNIA 95724
(916) 426-3683

| | | NAME 1 | NAME 2 | NAME 3 | NAME 4 | | |
|---|---|---|---|---|---|---|---|
| NAME (IF MORE THAN 1 PERSON) | | | | | | CASH ☑ | CHARGE ☐ |
| WEIGHT AND ABILITY | 175 BEG. ADV. | | BEG. INT. ADV. | BEG. INT. ADV. | BEG. INT. ADV. | VISA ☐ | MASTER CHARGE ☐ |
| KIS | | 6190628 | | | | SUGAR BOWL CREDIT CARD NO. | |
| BOOTS | | 10 5/3 2 2 | | | | ROOM NO. | |
| POLES | | | | | | CHARGED BY | |
| DEMO SKIS | | | | | | 1) | 14.50 |
| HI PERFORMANCE SKIS | | | | | | 2) | |
| AMOUNT | 14.50 | | | | | 3) | |
| BINDING SETTING | | | | | | 4) | |
| ECH. INITIALS | | C.B. | | | | BREAKAGE COVERAGE $1.00/PR. | |
| | | | | | | TOTAL | 14.50 |

PLEASE READ & SIGN THE AGREEMENT ON THE REVERSE OF THIS FORM. LIMITED LIABILITY

DATE

Customer initially specified an 'A' type setting hence the original setting of 8.DiN

Following discussion customer advised he was L. type therefore setting revised to 7 DiN prior to customer leaving store

APPENDIX "A"

000457

EXHIBIT B

## PLEASE READ & SIGN THIS AGREEMENT · iT RELEASES US FROM LIABILITY

The undersigned accepts for use **as is** the equipment listed on this form and accepts full responsibility for the care of this equipment while it is in his or her possession, and agrees to reimburse the Klein's Ski Shop for any loss or damage other than reasonable wear resulting from use.

It is understood the bindings furnished herewith are bindings designed to reduce the risk or degree of injuries from falling, and that despite the fact that adjustments are according to manufacturers recommendations, it is understood that the bindings will not release under ALL circumstances and are no guarantee for the user's safety.

It is understood how the binding works. Do not change any binding adjustments, come back to the rental shop for free assistance. The undersigned acknowledges that there is an inherent risk of injury in the sport of skiing, and use of any ski equipment, and expressly assumes the risks for any damages to any persons or property resulting from the use of this equipment.

It is furthermore expressly agreed that the undersigned shall hold the Klein's Ski Shop and/or its employees, the Sugar Bowl Corporation and/or its employees harmless and release them from any and all responsibility or liability for damage and injury to the equipment user or to any person or property whether resulting from the negligence (active or passive/past, present or future) or whether resulting from the selection, inspection or adjustment of this equipment (active or passive/past, present or future) by the Klein's Ski Shop and/or its employees or whether resulting from the use of this equipment by the user.

SIGNATURE OF PERSON RESPONSIBLE FOR EQUIPMENT